# SEPARATE MEMORANDUM WITH POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

1

**TABLE OF CONTENTS**

2  CLAIM ONE; TRIAL COUNSEL PROVIDED INEFFECTIVE
3           ASSISTANCE OF COUNSEL, THEREBY,
           VIOLATING MY SIXTH AMENDMENT RIGHT
           PURSUANT TO THE U.S. CONSTITUTION..............PGS.1-20

4

5

6

7  CLAIM TWO: ADMISSION OF GRAFFITI EXHIBITS
8           No.13,51-F,51-H,51-K AND 51-M
           WAS ERROR BECAUSE THE EVIDENCE
           WAS IRRELEVANT, UNDULY PREJUDICIAL
9           AND VIOLATED MY FIFTH AND FOURTEENTH
           AMENDMENT RIGHTS...............................PGS.21-24

10

11

12

13         CONCLUSION....................................PGS24

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

1

**TABLE OF AUTHORITIES**

2    Remmer v. U.S.,347 U.S. 227[1954]....................PG.3

3    U.S. v. Sarkisian, 197 F3d 966[9th Cir.1999]........PG.3

4    Lockhart v. Terhune,250 F3d 1223[9th Cir.2001].........PG.5

5    People v. Smith,249 Cal.App.2d 395,57 Cal.Rptr.508.........PG.6

6    Wiggins v. Smith,539 U.S. 510[2003].................PG.6,8

7    Mitchell v. Mason,325 F3d 732[6th Cir.2003]..........PG.6,8

8    People v. Lee[1994]28 CallApp.4th 1724,1739-1740........PG.8

9    Splunge v. Parke,160 F3d 369[7th Cir.1998].............PG.8

10   Mason v. Mitchell,320 F3d 604[6th Cir.2003].............PG.8

11   Wisehart v. Davis,408 F3d 321[7th Cir.2005].............PG.10

12   Luna v. Cambra,306 F3d 954[9th Cir.2002]................PG.16

13   Groseclose v. Bell,130 F3d 1161,1170 [6th Cir.1997].......PG.16

14   Johnson v. Mcbride,381 F3d 587[7th Cir.2004]............PG.16

15   Harris v. Wood[9th Cir.1995] 64 F3d 1432,1438............PG.20

16   People v. Humiston,Supra,20 Cal.App.4th 460,481............PG.21

17   People v. Wright,Supra,39 Cal.3d at p.585...............PG.23

18

19   **STATUTES**

20     Evidence Code 1103.........................PG.6

21     Evidence Code 352..........................PG.22

22     Evidence Code 1101.........................PG.23

23

24

25

26

27

28

1   **Ramon Contreras #V-99014**
    Kern Valley State Prison
2   P.O. Box 5104
    Delano, CA.93216
3

4                    **UNITED STATES DISTRICT COURT**
                    **SOUTHERN DISTRICT OF CALIFORNIA**
5                                              •

6   Ramon Ivan Contreras_____      )
                    Petitioner,      )
7                                    )
         V.                          )          **SEPARATE MEMORANDUM WITH**
8   A. Hedgpeth, Warden_____        )          **POINTS AND AUTHORITIES**
                    Respondent.      )
9   _____      )

10

11            **CLAIM ONE: INEFFECTIVE ASSISTANCE OF COUNSEL**
                              **I.(A)**
12

13      From the beginning of voir dire, my attorney and I began to have a conflict

14  of interest, due to the fact that I didn't agree with him, on several of the

15  jurors he decided to have submit over my case. For example, one juror stated,

16  that he grew up in a gang enviornment and would get beaten by gang members,

17  while walking home from school.(See trial transcript pgs.223-224.) Counsel

18  knew that throughout my trial, there was going to be extensive testimony

19  about gang members and what they do. Counsel's decision to keep this particu-

20  lar juror, didn't make any sense. Another juror I wanted excused from the

21  panel, was a judge that worked at the same court, where I was being tried at.

22  I felt insecure to have this particular juror submitting in the jury, and

23  counsel had no consideration for what I had to say. His actions showed me,

24  that he wanted to get done with my trial as soon as possible, because he never

25  excused any of the intial twelve jurors, and the jury was picked within a day

26  and a half; having known the severity of the charges, jury selections should

27  have lasted longer. I present this allegation, to establish that my trial

28  attorney was deficient and employed poor tactics from the start of my trial

                                    1

1  proceedings, and continued throughout the trial. Since, counsel and I were

2  disagreeing on the jurors, are disagreements continued throughout the trial.

3                                    I.(B)

4      Counsel's conduct, the way he raised his voice, asked questions, and carr-

5  ied himself during voir dire and throughout the the trial, caused a prejudi-

6  cial affect towards me, from the jury. During voir dire, after the twelve

7  jurors were chosen to submit over my case, and the attorney's were question-

8  ing potential alternate jurors, two prospective jurors made extremely prejudi-

9  cial comments about my attorney. Prospective juror nineteen stated,"I have

10  already formed an opinion in the case, because I don't like a certain attor-

11  ney." She was referring to my attorney. The judge asked juror nineteen,"Be-

12  cause you feel uncomfortable with one of the attorney's that might affect

13  your ability to be fair"? Juror nineteen stated,"That's not what I would want

14  to do, but it may happen." Back in chambers, prospective juror nineteen went

15  on to say, that my attorney during questioning was talking down to people, and

16  was being pompous.(See trial transcript pgs.376-381.)

17      Prospective juror twenty-three made very damaging comments about my attor-

18  ney. One comment in particular made numerous people inside the courtroom, in-

19  cluding several of the twelve sworn in jurors, laugh at my attorney. Prospec-

20  tive juror twenty-three said my attorney,"Wasn't a sincere lawyer, didn't look

21  sincere of whom he was representing, and would do anything to get his client

22  acquitted." She went on to say, that my attorney,"Was the only attorney in the

23  courtroom that gave her an immediate 'EEUWWW' gut feeling." She also basically

24  said that gang members don't deserve a fair trial.(See trial transcript pgs.

25  441-445.) Prospective juror twenty-three, made my attorney look like a crooked

26  attorney in the presence of the twelve jurors that submitted over my case.

27      Clearly, the comments made by the two prospective jurors were prejudicial

28  and became an outside influence upon the twelve jurors that submitted over my

1   case.(See Remmer v. U.S.,347 U.S. 227[1954].) After, the jury heard those com-

2   ments, they became tainted, and it's highly probable that they felt the same

3   way towards my attorney. Moreover, my co-defendants attorney, Mr.White, had

4   the same concerns, regarding what was said by the two prospective jurors. Dur-

5   ing a side bar, out-side the presence of the jury, Mr.White motioned for sever-

6   ance or a mistrial. He stated,"I am sure some of the other twelve jurors share

7   the same sentiments expressed by the two prospective jurors, and we don't know

8   that, because they were not voir dired on that issue." He went on to say,"I am

9   afraid that the attitude may spill over to my client and affect his right to

10   a fair trial, even to effective assistance of fair counsel."(See trial trans-

11   cript pgs.554-556.) Clearly, Mr.White, thought the prejudicial affect of those

12   comments, was going to be so big, that it was even going to affect his client.

13   It definitely had an affect on me, and it showed on the way the verdicts turn-

14   ed out. I was found guilty of first degree murder and my co-defendant of second

15   degree; while both of us were found guilty of first degree attempted murder,

16   when I only fired once and my co-defendant fired twice.

17      In the Court of Appeal opinion, one statement it makes, is that, since the

18   trial court pre-instructed the jury to determine the facts only from the evi-

19   dence presented at trial and that it must not be biased against the defendants,

20   they presumed the jury followed those instructions.(See pg.3 of Court of Appeal

21   opinion.) The court shouldn't of just presumed the jury followed those instruc-

22   tions, because it's impossible to know what was going on in the jurors minds

23   and how much of an impact those comments had on them, because they were never

24   asked if they felt the same way towards my attorney. Furthermore, a defendants

25   sixth Amendment right is violated even if only one juror was unduly biased or

26   improperly influenced.(See U.S. v. Sarkisian, 197 F3d 966[9th Cir.1999].) I

27   also present this allegation, to give the court an idea of the attorney I had

28   to coexist with, and the hostile enviornment that arose between him and I, due

3

1  to his conduct, and his continuance disregard for what I had to say. Moreover,

2  counsel once again showed to be deficient, for not being the attorney to file

3  for a mistrial.

### I.(C)

5      Counsel failed to do an investigation into what would've been important

6  evidence at my trial. He then lied to me about it. About a year prior to my,

7  trial, I told counsel to check if, Jimmy Martinez(the deceased) had a criminal

8  background. Counsel then informed me, that he checked into it, but found that,

9  Mr.Martinez had no adult or juvenile record. I then read two police reports

10  that made me believe, my attorney lied regarding, Mr.Martinez criminal back-

11  ground. In one police report, Mr.Martinez's mother stated, that Mr.Martinez

12  had been in a fight, for which he had to appear in court, January,26,2004, and

13  had spent time in Campo. In the second police report, Mr.Martinez's girlfriend

14  stated, that Mr.Martinez had been locked up for attempted murder.(See police

15  reports 31 and 121.) After reading what the police reports stated, I contacted

16  counsel and told him what the reports stated, and that Mr.Martinez must have

17  a record. Counsel responded by saying, that he was sure, Mr.Martinez didn't

18  have a criminal background, because he personally checked into it.

19      On May,31,2006, I filed a petition for disclosure of juvenile court re-

20  cords, to the San Diego Superior Court Juvenile Department. On June,13,2006,

21  I received, Mr.Martinez's record. Furthermore, since May of 2006, my father

22  was trying to obtain my client file, from my trial attorney. My father had a

23  difficult time contacting counsel. It wasn't until April of 2007, that my

24  father got a hold of counsel. Counsel then informed my father, that I must

25  write him a letter giving him authorization to give my file to my father.

26  Therefore, on April,19,2007, I wrote counsel a letter, giving him authoriza-

27  tion to give my file to my father.(See copy of letter.) Counsel gave my father

28  the file, which consisted of four computer discs. Looking through my file,

4

1   under the discovery that was turned over by the prosecution, my father came

2   across a San Diego Regional Arrest/Juvenile Contact Report pertaining to Mr.

3   Martinez.(See Contact Report.) The charge that appears in that report, is the

4   same charge contained in, Martinez's record, which he pled guilty to. Thus,

5   proving my attorney did lie to me, and either intentionally or due to his in-

6   ability to conduct an adequate investigation, withheld valueable information

7   from my trial that would've helped my defense. I deserved to have had a loyal

8   attorney representing me.(See Lockhart v. Terhune 250 F3d 1223[9th Cir.2001].)

9       Reading through, Mr.Martinez record, it will show that due to a December,6,

10  2001. incident, Mr.Martinez was charged with: Assaulting another with a deadly

11  weapon, in violation of P.C.245(a)(1); doing it in association with a criminal

12  street gang, P.C.186.22(b)(1); carrying a concealed weapon (dirk&dagger) in

13  violation of P.C.12020(a); and unlawfully harboring someone, in violation of

14  P.C.32. Due to a June,13,2002, incident, Mr.Martinez was charged with: Using

15  force and violence upon his mother, in violation of P.C.242; unlawfully being

16  under the influence, in violation of P.C.647(f); and resisting arrest, in vio-

17  lation of P.C.148. Mr.Martinez pled guilty to P.C.245(a)(1), in exchange all

18  other counts were dismissed with a Harvey Waiver. Furthermore, Mr.Martinez's

19  record contained an evaluation conducted by a screening committee. The screen-

20  ing committee determined that, Mr.Martinez was gang entrenched and substance

21  abusing, and since, Mr.Martinez was involved in a potential lethal act of vio-

22  lence he was at risk for further violence.(See Mr.Martinez's criminal record.)

23      Since, the defense in my case was self-defense, the information contained in

24  Mr.Martinez's record was crucial to my defense, and should've been presented at

25  trial. Therefore, counsel's failure to conduct an investigation into,Mr.Marti-

26  nez's criminal background in order to obtain his record and present it at trial,

27  prejudiced my defense. The jury never heard nothing pertaining to, Mr.Martinez's

28  violent character, and they should have, because specific acts of violence

1   committed by the alleged victim are admissible in self-defense cases.(See
2   People v. Smith,249 Cal.App.2d 395,57 Cal.Rptr.508; and evidence code 1103.)
3   An effective attorney would've done an investigation into, Mr.Martinez's cri-
4   minal background, obtained Mr.Martinez's record and introduced it into evidence.
5   Furthermore, since it was a fact, that Mr.Martinez before exiting his vehicle
6   changed his shoes and reached into the glove box to obtain a knife, which was
7   found next to him.(See trial transcript pgs.1330-1331 & police report #100.) An
8   effective attorney during his or her closing argument would've concentrated on
9   that particular issue; thereby, arguing that since, Mr.Martinez already had a
10  prior for carrying a concealed weapon(dirk&dagger), assaulting someone with a
11  deadly weapon likely to produce great bodily injury, and a screening committee
12  having determined that Mr.Martinez was at risk for committing further violence,
13  Mr.Martinez's actions before exiting his vehicle the night of January 6,2004,
14  definitely were of one who was ready to commit another act of violence.

15      The Court of Appeal, took this particular allegation as if I were present-
16  ing it to argue that my attorney failed to impeach, Mr.Martinez with his cri-
17  minal record.(See pg.4 of Court of Appeal opinion.) It was very unreasonable
18  for the Court of Appeal to have taken this allegation the way they did, because
19  when I presented the allegation to the court, at no time in the paragraphs
20  where I argue this particular issue, do the words "Failure to impeach" appear.
21  The court completely gave me the runaround regarding this issue. The bottom
22  line, counsel failed to conduct a reasonable pre-trial investigation into,
23  Mr.Martinez's criminal background, and failed to fulfill his constitutionally
24  imposed duty to investigate my case.(See Wiggins v. Smith,539 U.S. 510[2003]);
25  Mitchell v. Mason,325 F3d 732 [6th Cir.2003].)

26                              I.(D)

27      Once again, counsel failed to do a reasonable pre-trial investigation.
28  This time into the criminal background of the prosecution's main witness,

                                    6

1  Filiberto Lamas. Due to counsel's failure to conduct an investigation into,
2  Mr.Lamas's criminal background and obtain his record, counsel failed to im-
3  peach, Mr.Lamas with his respective criminal record. On July,10,2006, I filed
4  a petition for disclosure of, Mr.Lamas's criminal background. On August,7,2006
5  I received, Mr.Lamas's criminal record. Had counsel bothered to obtain, Mr.
6  Lamas's record, he would've found that, Mr.Lamas was guilty of several crimes.
7  On March,7,2002, Mr.Lamas was in violation of P.C.42525(a)/10hcApril,19,2002,
8  he was in violation of P.C.12020(a)/17bc; On August,31,2003, he was in vio-
9  lation of P.C.148; And on November,15,2003, he was in violation of P.C.12020(a).
10     Furthermore, had counsel obtained, Mr.Lamas's criminal record, he would've
11  acquired valueable information he could've used on his cross-examination with,
12  Mr.Lamas. For example, on page six of, Mr.Lamas's record, it states that he
13  has a tatoo of three dots inside his right middle finger. On a police report,
14  Mr.Lamas states that he was one of the founders of his gang and that the foun-
15  ders have tatoo on their middle fingers.(See police report #51.) At trial,
16  Mr.Lamas denied ever saying that. Had his record been presented, clearly, he
17  would've been caught in a lie; thus hurting his credibility. Another example,
18  on page nine of Mr.Lamas's record, it states that he has anger management
19  issues, and a probation officer strongley recommended that he become involved
20  in a domestic violence program or battered treatment program, in order to
21  break the cycle of violence. Final example, due to his probation, Mr.Lamas
22  was given forty-five conditions he had to comply by. The night of the incident
23  (1-6-04) Mr.Lamas was in violation of two of his conditions. He was violating
24  condition #19 by being out of his residence between 6:00p.m. and 6:00a.m, and
25  condition #40 by being in the company of a O.E.K. gang member (Mr.Martinez).
26  (See Mr.Lamas's criminal record.)
27     Counsel's failure to present, Mr.Lamas's criminal record, prejudiced my
28  defense, because Mr.Lamas could've been impeached with his criminal record.

7

1  (See People v. Lee[1994] 28 Cal. App.4th 1724,1739-1740.) Resulting in the

2  judge giving some type of instruction to the jury, regarding, Mr.Lamas's credi-

3  bility. In addition, counsel not only failed to do a pre-trial investigation

4  to obtain, Mr.Lamas's criminal record,(Wiggins v. Smith,539 U.S. 510[2003]);

5  Mitchell v. Mason 325 F3d 732[6th Cir.2003].) but by his failure to present,

6  Mr.Lamas's record, he violated my federal due process right to confront and

7  cross examine witnesses. Since, Mr.Lamas was in violation of two conditions

8  of his probation on the night of the incident (1-6-04), an effective attorney

9  while cross-examining him, would've tried to expose a potential source of bias

10  or motive for his testimony. For example, asking, Mr.Lamas, wheather he was

11  going to be receiving some type of benefit, like being taken off probation in

12  exchange for his testimony or if he was ever told by police officers, that he

13  could be charged with, Mr.Martinez's death, if he didn't cooperate.(See

14  Splunge v. Parke,160 F3d 369[7th Cir.1998]); (Mason v. Mitchell,320 F3d 604

15  [6th Cir.2003].) Basically, an effective attorney would've done an investiga-

16  tion into, Mr.Lamas's criminal background, obtained his criminal record, in-

17  troduced it into evidence, cross-examined him regarding every bit of damaging

18  information contained in it, and finally impeached him with it.

19                                    I.(E)

20     While cross-examining witnesses, counsel didn't do a good job, he would

21  often get names and incidents mixed up. I would write down important questions

22  for counsel to ask certain witnesses, but he wouldn't ask them. For example,

23  one important question I wanted counsel to ask, was supposed to be intended

24  for three prosecution witnesses, Ms.Suszko, Ms.Crownover and Ms.Soto. Ms.Susz-

25  ko testified to what she saw and heard the night of January,6,2004. On a pol-

26  ice report, Ms.Suszko said she heard, Ms.Soto telling police officers that

27  earlier in the day they were in a confrontation with subjects in a Mustang.

28  (See police report #105.) On another police report, Ms.Crownover said she gave

8

1  Ms.Soto a blanket, and heard Ms.Soto telling police officers, that they were

2  in a conflict earlier in the day with the subjects in the Mustang.(See police

3  report #111.) Counsel failed to question, Ms.Suszko and Ms.Crownover, regard-

4  ing what they heard, Ms.Soto telling police officers. Counsel then failed to

5  ask, Ms.Soto, if she along with, Mr.Lamas and Mr.Martinez, were involved in a

6  conflict earlier that day(1-6-04) with people in a Mustang.

7      In the Court of Appeal opinion, regarding this allegation, it states that

8  counsel had a clear tactical reason for not eliciting the evidence as it might

9  have strengthened the prosection's case that the shootings were retaliatory.

10  The evidence would also have undercut my testimony that I never seen the Honda

11  before, and had no idea who was in the car.(See pg.6 of Court of Appeal opi-

12  nion.) I completely disagree, because had counsel asked, Ms.Soto that question,

13  she only could've gave a response that would've helped my defense. By saying

14  that they were in a conflict earlier that day with people in a Mustang, but

15  it was with different people in a different Mustang. If counsel was aware that

16  the night of the incident, I didn't leave my parents house until around 6 or

17  7 p.m., and that Ms.Welch (the owner of the Mustang) didn't let me borrow the

18  Mustang until around 11 p.m. Therefore, counsel didn't have a tactical reason

19  for not eliciting this line of questioning. He was just not involved with my

20  case, and that is why he failed to properly prepare himself, to adequately

21  cross-examine witnesses. Had, Ms.Soto, stated that they were involved in a

22  conflict with people in a Mustang that day other than with me and the Mustang

23  I was driving, then it would've strengthened my defense, because it would've

24  showed that, Mr.Lamas and Mr.Martinez, got out of their vehicle and approached

25  my vehicle thinking they were going to confront the same Mustang from earlier

26  that day.

27      Another example, that proves counsel failed to properly prepare himself,

28  in order to conduct adequate cross-examinations, is one that I didn't present

9

1  to the state courts. The reason I didn't present it was, because as I pre-

2  viously stated in I.(C) paragraph two, my father wasn't able to obtain my

3  client file until April of 2007.(If needed please refer to I.(C) paragraph 2

4  lines 21-27 for full explanation.) Once my father obtained my client file, he

5  was looking through the discovery that was turned over by the prosecution,

6  and he came across a document titled "Benefits for Maria Soto". The document

7  shows that from April,27,2004 to December,30,2004, the district attorney's

8  office provided, Ms.Soto with ten-thousand nine-hundred ninety-seven(10,997)

9  dollars. Which consisted in the paying of her rent, bills, food, clothes, and

10  other miscellaneous items.(See document "Benefits for Maria Soto".) This shows

11  counsel didn't even research the discovery turned over to him by the prosecu-

12  tion because he could've used this document on his cross-examination with,

13  Ms.Soto. An effective attorney knows that when the prosecution is giving a

14  witness benefits, such as leniency, cash, or anything else, it can be used

15  to undermine the witness.(See Wisehart v. Davis,408 F3d 321[7th Cir.2005].)

16                                          I.(F)

17      Counsel failed to call upon three witness (Frank Soto, Alejandra Hurtado

18  and John Huynh) to testify on behalf of my defense; after we had agreed that

19  they were vital to my defense. Counsel subpoenaed, Ms.Hurtado and Mr.Huynh;

20  both appeared in court and were ordered by the judge to return on a later

21  date so they could make arrangements with counsel. Mr.Soto the most important

22  witness out of the three, wasn't even subpoenaed.

23      I was prejudiced by counsel's failure to have, Mr.Soto testify at my

24  trial. The prosecution had damaging evidence against me; a graffiti exhibit

25  that consisted of a drawing of two guns with a plus sign in between the guns,

26  an equal sign with the numbers 187, and a phrase that stated "Quit being a

27  bitch and kill someone".(Which is the graffiti exhibit contained in claim

28  two of the present petition.) Since, the prosecution was accusing me of

1   having drawn the graffiti, it was extremely damaging to my claim that I fired

2   in self-defense.

3        From the beginning of my case, counsel wanted to know where I had gotten

4   the gun from. I told counsel, that I got the gun from, Mr.Soto. I also inform-

5   ed counsel, that since my arrest, I had spoken to, Mr.Soto, and he admitted

6   to doing the graffiti. Counsel asked me, if Mr.Soto was willing to testify at

7   my trial. I told counsel to contact, Mr.Soto, in hopes that he could convince

8   Mr.Soto to testify, by explaining to him, that by testifying he would be help-

9   ing me. Counsel did contact Mr.Soto, and Mr.Soto agreed to testify at my trial.

10  Counsel kept in contact with, Mr.Soto, by phone. Then a week before trial

11  started, counsel informed me that he wasn't going to be calling on, Mr.Soto

12  to testify. I completely disagreed with counsel, and I told him that I wanted,

13  Mr.Soto to testify, because his testimony would help my defense, but counsel

14  disregarded my request.

15       After my conviction I spoke with counsel, and I asked him to send me the

16  report of the statements, Mr.Soto gave. Counsel informed me, that he never

17  made a written document of, Mr.Soto's statements. I later wrote him a letter

18  asking, if he could send me a letter stating what, Mr.Soto had told him, but

19  counsel never responded. Therefore, I told my father to contact, Mr.Soto, and

20  ask him, if he was willing to go to a Notary Public office, to have a letter

21  notarize that states he did inform counsel that he was the one who did the

22  graffiti and gave me the gun. Mr.Soto agreed to do it.(See Mr.Soto's nota-

23  rized letter.)

24       There is no conceivable reason for counsel's failure to call, Mr.Soto to

25  testify. I was being accused of premeditation because of the graffiti done

26  by Mr.Soto. Furthermore, the prosecution referred to the graffiti exhibit in

27  his closing arguments.(See trial transcript pgs.2628 & 2750.) The jury went

28  into deliberations believing that I did the graffiti. Any reasonable attorney

11

1  would've called, Mr.Soto to testify, so Mr.Soto could personally tell the jury

2  that he was the one who did the graffiti. In the Court of Appeal opinion, it

3  states that this proposed evidence was duplicative of my own testimony and,

4  Mr.Slagle's testimony.(See pg.4 of the Court of Appeal opinion.) When I testi-

5  fied, I did state that, Mr.Soto gave me the gun and did the graffiti. Mr.Slagle

6  testified that he later learned, Mr.Soto was the one who did the graffiti. How-

7  ever, officer Moulton, during his testimony completely discredits, Mr.Slagle.

8  First, on direct examination, officer Moulton stated that, Mr.Slagle told him

9  that  my co-defendant and I did most of the graffiti.(See trial transcript pg.

10  1597.) Later, on redirect examination, the prosecutor asked officer Moulton,

11  "What exactly did Mr.Slagle say about the graffiti under the stairs"? Officer

12  Moulton answered, "Larry and Ramon did that artwork." (See trial transcript pg.

13  1641.) After, officer Moulton discredited, Mr.Slagle, it didn't matter that

14  when I took the stand I stated that, Mr.Soto was the one who did the graffiti,

15  because an officer already had stated otherwise. Therefore, this evidence was

16  not duplicative. It is very different, for me to just state that, Mr.Soto did

17  the graffiti and gave me the gun, compared to, Mr.Soto actually taking the

18  stand and personally stating, that he did the graffiti and gave me the gun;

19  that would've had an impact on the jury. In addition, counsel was unprofession-

20  al, because he didn't make a written report of the information, Mr.Soto had

21  given him.

22      Counsel failed to have, Ms.Hurtado testify at my trial. After, I had re-

23  ceived several letters with information I thought could help my defense, from

24  Ms.Hurtado, I notified my attorney about the letters. In December of 2004, my

25  attorney and my co-defendants attorney went to the county jail I was at to talk

26  to me. At that time, I showed them four letters; along with the postmarked

27  envelopes they came in. My attorney, agreed that the information contained in

28  the letters was important for my defense. Before, they left, my co-defendants

12

1  attorney put the letters in his jacket pocket, and was asked by my attorney, if

2  he could have his investigator contact, Ms.Hurtado.

3      The investigator working on behalf of my co-defendant contacted, Ms.Hurtado.

4  Ms.Hurtado told the investigator that, Mr.Lamas, who she refers to as Hitman in

5  her report, was jealous of my co-defendant because he was dating her. Ms.Hurta-

6  do also said, that Mr.Lamas, told her to inform my co-defendant to be careful,

7  because he was going to get him. Ms.Hurtado was with my co-defendant during the

8  daytime of January,6,2004, which was the day the incident took place.(See Ms.

9  Hurtado's interview report pgs.1-4.)

10     Regarding this issue, counsel once again shows, that he failed to conduct

11  an investigation on my behalf. Counsel should've sent an investigator working

12  for him or gone himself to speak to, Ms.Hurtado. Since, counsel had my co-

13  defendants attorney conduct the investigation, Ms.Hurtado, was never asked any

14  questions pertaining to the comments she made on the letters she wrote me.

15  There were two important things, Ms.Hurtado needed to be questioned about. Num-

16  ber one, on a letter, Ms.Hurtado wrote me, November,20,2004, she asked me,"Why

17  do you think that Sparky from B.D.S. faught Larry the day you guys got busted"?

18  She goes on to say, "Carlos told all his homies that if they saw Larry to beat

19  his ass."(Carlos is Ms.Hurtado's cousin.) Number two, counsel was aware that

20  my co-defendant took, Ms.Hurtado home in the same car I was driving when the

21  incident took place, and around the time I showed him the letters, I informed

22  him that when, Ms.Hurtado was dropped off by my co-defendant, her cousin saw

23  her getting dropped off and        told her that his homies now will know what

24  car my co-defendant is driving.

25     In the Court of Appeal opinion, it states that before trial, the court dis-

26  cussed the letters, that Ms.Hurtado had written to Mr.Torres; including a let-

27  ter telling her story and asking wheather that is "What is it that you want me

28  to tell them". The prosecution indicated that it planned to impeach, Ms.Hurtado

13

1   with those letters if she took the stand; accordingly, there was a clear tac-

2   tical reason for counsel to not call, Ms.Hurtado to the stand.(See pg.4 of

3   Court of Appeal opinion.)

4       The prosecution never mentioned that it had a letter where, Ms.Hurtado is

5   telling her story. The prosecution only mentioned one letter, that he would

6   use to impeach her with.(See trial transcript pgs.66-67.) Had my attorney

7   taken a look at the letter the prosecution was referring to, and questioned,

8   Ms.Hurtado about it, he would've realized that the prosecution was interpre-

9   ting the context of the letter to his benefit. The reason, Ms.Hurtado was ask-

10  ing my co-defendant what she was supposed to say to the investigator was,

11  because she had no clue why my co-defendant wanted her to speak to an investi-

12  gator, and she was scared of speaking to one. Moreover, counsel could've pro-

13  ven that point, by presenting the letters my co-defendants attorney had. For

14  example, on a letter, Ms.Hurtado wrote me, November,7,2004, she says my co-

15  defendant nine months earlier had asked her for help, and told her the D.A. or

16  investigator was going to call her or go to her house to speak to her, but she

17  never heard from either one. In that same letter, she also asked me what she

18  is supposed to do. On a letter she wrote me, November,20,2004, she says,"About

19  the investigator, i'm kinda scared." "I've never talk to one and they seem

20  intimidating." Ms.Hurtado also says she is scared of speaking to the investi-

21  gator on a letter she wrote me, December,1,2004.(See copies of the letters

22  along with a photocopy of the stamped envelope they were returned in.)

23      The reason I didn't present these letters to the state courts is, because

24  I didn't get the letters back in my possession until after I had already sent

25  my petition for review to the California Supreme Court. The reason it took so

26  long for me to get the letters back was, because my co-defendants attorney,

27  Mr.White had the letters in his possession for about two years. Since, the

28  date of my sentencing (9-23-05) my father had been trying to obtain the let-

14

1. ters from Mr.White. Mr.White told my father that he was going to send the let-
2. ters to him, but he never did. My father continued trying to contact, Mr.White,
3. but Mr.White wouldn't return his calls. I wrote, Mr.White a letter, February,
4. 23,2006, asking for the letters, but Mr.White never responded.(See copy of
5. letter.) It wasn't until, October of 2006, that my father was able to speak to,
6. Mr.White. Mr.White informed my father, that he would have to send him a check
7. for one-hundred dollars, so he could return the letters to him. My father did
8. send the check to Mr.White.(See copy of check.) After, my father sent the check,
9. it took about a month and a half for, Mr.White, to contact my father and inform
10. him that he could go pick the letters up at his office; in which case, my
11. mother went to pick them up. On December,19,2006, I received the Court of App-
12. eal opinion, denying my habeas corpus petition, and a couple of days later, I
13. received a letter from my father notifying me that he had the letters. There-
14. fore, I wrote my father a letter telling him to send me the letters, but around
15. that time mail was taking about a month to get to me, and I knew that I only
16. had a short period of time to file my petition for review, so after waiting
17. for three weeks without receiving the letters, I sent my petition for review
18. to the California Supreme Court around, January,11,2007.
19.      Counsel failed to have, Mr.Huynh testify at my trial. The prosecution's
20. theory, was that my co-defendant and I were out driving around the night of
21. January,6,2004, looking to kill O.E.K. gang members. My attorney was aware that
22. the reason my co-defendant and I left the house we were at was, because my co-
23. defendant received a call from, Mr.Huynh, asking him to go to his apartment,
24. and my co-defendant asked me for a ride, so I gave him one. Before leaving, Mr.
25. Huynh's apartment, Mr.Huynh knew that our intentions were to stop at a Jack In
26. The Box, and then go back home. At no time did, Mr.Huynh hear my co-defendant
27. or I talking about looking for someone to kill, nor did he see us with guns.
28. (See Mr.Huynh's interview report pgs.1-2.)

15

1  that was talked about. The prosecution elicited extensive and damaging testi-

2  mony regarding the marijuana dealing, from four of its witnesses, my father,

3  Mr.Slagle, Detective Taub and Detective Hoefer.

4      In the Court of Appeal opinion, it states, that counsel had a tactical

5  reason for broaching the subject as part of the defense theory that the defend-

6  ants were not hunting for rival gang members since both of the defendants sold

7  marijuana, people would sometimes flag down Contreras's car and the defendants

8  had marijuana and cash on hand at the time of the murder.(See pg.6 of the

9  Court of Appeal opinion.)

10      I don't see how the Court of Appeal came to that conclusion, because

11  according to the prosecution in this case, the reason why the marijuana evi-

12  dence became part of the case, is one very different to the one the Court of

13  Appeal gave. When the prosecution questioned my father about seven-thousand

14  three-hundred dollars that was found in his bedroom, my attorney objected,

15  which brought a side bar meeting in which my attorney and the prosecutor got

16  into a heated argument over the marijuana evidence.(See trial transcript pgs.

17  580-593.) Clearly, that was something my attorney could have avoided, had he

18  just excluded the marijuana evidence. The prosecution makes it very clear,

19  that he was not going to get into the drug stuff, because it was irrelevant

20  to the case, and it only became part of the case because, Mr.Torres's defense

21  stated that was why he had to have a gun because he was out making sales and

22  was afraid.(See trial transcript pg.586.) Furthermore, in the opening state-

23  ments and closing arguments conducted by both defense attorney's, they never

24  mention anything closely similar to the reason the Court of Appeal gave for

25  counsel's tactical reason for broaching the subject. As a matter of fact, my

26  attorney never even mentions the marijuana dealing in his closing argument.

27      The prosecution asked, Mr.Slagle, if he told officer Moulton, that I sold

28  marijuana and I would go fairly often to his apartment to supply him and

1  others with marijuana; Mr.Slagle answered yes.(See trial transcript pgs.937-
2  938.) The prosecution asked, Mr.Slagle a series of argumentative questions,
3  with one of its questions insinuating that my co-defendant was working as secu-
4  rity for me. The prosecution asked, "Aren't you telling us, Mr.Slagle, that
5  Torres was security for sales"? "That he helped by being security"? Mr.Slagle
6  went on to say that my co-defendant ran errands for me, and that it was my
7  business.(See trial transcript pgs.1011-1012.) Mr.Slagle, basically, said that
8  I was the main one, and that testimony continued when my co-defendants attorney
9  cross-examined Mr.Slagle.(See trial transcript pg.1017.)
10     Detective Taub provided extensive and detailed testimony regarding the
11 marijuana dealing. My attorney asked for a side bar because he wanted to object
12 to the seven-thousand three-hundred dollars found in my fathers bedroom, to
13 being used against me. While arguing his point, counsel said something very
14 interesting, because with his own words, it proves that his tactical strategy
15 to allow the marijuana dealing into evidence, was an unreasonable one. Counsel
16 states, that in his opinion, more than half of the jurors feel that gang mem-
17 bership is because of bad parenting, and if there is one thing that paints my
18 client as a drug dealer then it gives reason for my client being a gang member.
19 Counsel goes on to say, that if i'm in line with my father a drug dealer, it
20 paints me as being more evil. Moreover, the judge stated that there may be
21 several derived inferences that are a result of it.(See trial transcript pgs.
22 1491-1492.)
23     The prosecution theory was, that this was a gang war. Our defense was, that
24 we acted in self-defense and that we were not gang members. Before trial, the
25 defense moved to bifurcate the gang allegations from trial, but the motion was
26 denied. Since, counsel knew that the gang evidence was going to have a big im-
27 pact on the jury, and that the drug dealing evidence would give more weight to
28 the gang membership evidence and paint me as being more evil; Why, then allow

18

1   the drug dealing into evidence? Counsel's decision to allow the marijuana deal-

2   ing to be part of my trial, was not one of sound judgment.

3       Detective Taub testified, that he found bags containing marijuana residue

4   in my bedroom. He testified, that in my fathers bedroom, he found a large

5   amount of money ($7,300), which had a strong odor of marijuana on it. He also

6   found an electronic scale, and two notebooks with writing consistent with what

7   they call "pay&owe". Officer Taub went into great detail on what are pay&owe

8   books, which he compared to a checking account.(See trial transcript pgs.1493-

9   1495.) When it was the defense's turn to cross-examine officer Taub, both de-

10  fense attorney's questioned him about the marijuana evidence, which just ad-

11  vertised the subject more. My attorney even had him draw a pay&owe sheet.(See

12  trial transcript pgs.1509-1510.) In addition, my attorney had to bring back

13  officer Taub as a defense witness, just so he could say that the notebooks he

14  found in my fathers bedroom and had previously said where pay&owe books, were

15  not pay&owe books.(See trial transcript pgs.2123-2125.) All that was unnecess-

16  ary, and could've been avoided, had counsel just filed a motion to suppress

17  the marijuana evidence.

18      Detective Hoefer described the items he found in the car I was driving

19  when I was arrested. He stated he found a blue bag with a couple bags of mari-

20  juana, a black bag with more bags of marijuana, and a notebook that contained

21  weights, dollar amounts and names.(See trial transcript pg.1890.) The prosecu-

22  tion inquired furthermore into the marijuana items Mr.Hoefer had mentioned,

23  only this time, Detective Hoefer provides more detail. Mr.Hoefer stated, that

24  the blue Nike nylon bag contained baggies of marijuana ans a portable scale.

25  The black E.A. Sports bag contained multiple small ziploc baggies with pictures

26  of marijuana leaves on them, baggies of marijuana, a pocket scale, and a note-

27  book with the name Ramon Contreras. The prosecution asked Detective Hoefer to

28  describe the contents of the notebook, thereby, Mr.Hoefer went on to read out

19

1   loud the weights, dates, names and the amount they owed.(See trial transcript

2   pgs.1921-1926.)

3       Furthermore, when I took the stand, counsel didn't help the situation, be-

4   cause he asked me various questions about the marijuana dealing, which had no-

5   thing to do with his supposed tactical strategy. I answered his questions with

6   the truth, and by doing so it made me look worse.(See trial transcript pgs.

7   2420-2423.) Counsel shouldn't of asked me those questions; the jury just got

8   to hear more on that subject.Counsel didn't have a tactical reason for allow-

9   ing the drug evidence into trial, he just failed to suppress it. Counsel never

10  told me that he was allowing the drug evidence to stay for a particular reason.

11  I had to find out by reading the transcripts, that the prosecution wasn't go-

12  ing to get into any drug evidence, because it was irrelevant. The prosecution

13  benefited from counsel's failure because it didn't just get to use gang evi-

14  dence to paint me as a bad person, it also got the opportunity to use evidence

15  of me being a drug dealer, which was very prejudicial under the circumstances.

16      Counsel had a duty to represent me effectively, and he failed to do that.

17  The question in this case wasn't if I did it or not, but wheather I did it in

18  self-defense or if it was first degree murder. Even though, the jury was in-

19  structed on self-defense, counsel presented absolutely no favorable evidence

20  to back up my defense, because he never made an effort during the pre-trial

21  investigation period to obtain favorable evidence in order to present an eff-

22  ective defense at trial. The only reason the jury was instructed on self-

23  defense and manslaughter was, because of the testimony the two main prosecu-

24  tion witnesses (Mr.Lamas and Ms.Soto) gave. Had counsel not failed to do the

25  allegations in the present claim, the jury would not of found me guilty of

26  first or second degree murder. Looking at each of counsel's errors in isola-

27  tion may not warrant reversal, but it was their cumulative affect that preju-

28  diced me.(See Harris v. Wood [9th Cir.1995] 64 F3d 1432,1438.)

1                  **CLAIM TWO: ABMISSION OF GRAFFITI EXHIBITS WAS ERROR**

2     During trial the jury heard testimony, and seen pictures of graffiti exhi-

3 bits No.13,51-F,51-H,51-K and 51-M. The defense objected to the exhibits being

4 admitted into evidense.(See trial transcript pgs.72-73,1739-1740,1743-1745 and

5 1749.) The evidence was prejudicial, becauseeit uniquely tended to invoke pre-

6 judice against me, and inflame the jury's passion.(See pictures of exhibits.)

7     The graffiti in dispute was found in a storage closet, at an apartment my

8 codefendant was staying at. The prosecution was accusing my codefendant and I of

9 doing the graffiti found inside the closet. The prosecution presented exhibits

10 of the graffiti to show our association to El Cajon Locos. However, there were

11 various graffiti exhibits presented at trial,that specifically pertained to the

12 El Cajon Locos. It was not necessary to allow the introduction of the graffiti

13 exhibits in dispute, because it was not relevant to the main or even a collater-

14 al issue, and was not necessary to the proponent's case. Furthermore, the exclu-

15 sion of the evidence would not have undermined the prosecutions case nor dimin-

16 ished the gang membership evidence.

17     At trial the prosecutor asked the gang detective to read out loud what the

18 graffiti exhibits stated. Exhibit 13 consisted of a drawing of two guns with

19 the equation "41 Magnum * 357 Magnum= 187" it also stated,"Quit being a bitch

20 and kill someone". Exhibit 51-F stated, "380 El Cajon alcoholics serial killin

21 rapist I will fuck your mother." The gang detective wasn't even sure if 380 El

22 Cajon was part of the same writing.(See trial transcript pg.1743.) The closet

23 was covered in graffiti that it was difficult to tell what graffiti belonged

24 together. Exhibit 51-H stated, "Kill a cop today 187." Exhibit 51-K stated,

25 "Die pig die pig." Exhibit 51-M stated, "Fuck the pigs die pig die pig." After,

26 the jury heard and seen those remarks, it was so prejudicial that no juror co

27 could remain impartial. In People v. Humiston, supra, 20 Cal.App.4th 460, 481,

28 the court concluded that evidence the defendant used the number 187 should have

1   been excluded under evidence code section 352. In that case there was prove the

2   defendant used the Penal Code 187, but in the present case the prosecution

3   never had any solid evidence that I did the disputed graffiti. The evidence

4   admitted in Humiston, wasn't as prejudicial as in the present case, because

5   the number 187 doesn't just appear once but various times and it talks about

6   killing police officers. Accordingly, the evidence should have been excluded.

7        Due to the fact that I didn't even live at the apartment where the graffiti

8   was found, and that there was never anybody during the investigation that sta-

9   ted they personally saw me doing the graffiti; the graffiti exhibits in dis-

10  pute should have been excluded. The prosecution could argue, that my codefend-

11  ants roommates, Elaina Welch and Ryan Slagle, told police officers that my co-

12  defendant and I did most of the graffiti, and that at my residence officers

13  found a piece of line paper with the letters ECLS and clumsy written on it.

14  However, at trial, Mr.Slagle was asked by the prosecution, if he ever told de-

15  tective Moulton that my codefendant and I did the graffiti, and Mr.Slagle an-

16  swered no.(See trial transcript pg.937.) Mr.Slagle went on to say that the off-

17  icers were pushing him for the answers they wanted.(See trial transcript pgs.

18  972-974.) The prosecution asked, Ms.Welch, if she saw anyone writing graffiti

19  on the walls, and Ms.Welch answered no.(See trial transcript pg.1085.)

20       Regarding the fact that at my residence police officers found a piece of

21  line paper with the letters ECLS and clumsy written on it, and that the moni-

22  ker clumsy appeared twice in a list along with other monikers inside the stor-

23  age closet. That, still doesn't even prove I wrote those particular pieces of

24  graffiti, because any gang detective would testify that the moniker that app-

25  ears first on a roster is the person responsible for writing it. The moniker

26  clumsy never appeared first on any of the two rosters. In any event, I am not

27  disputing those graffiti exhibits or any other graffiti exhibits where El

28  Cajon Locos appears. I am just trying to make a point, that it was prejudicial

22

1   to have the exhibits admitted into evidence because of their content.

2       The exhibits in dispute were not necessary. THey were highly prejudicial and

3   violated my rights to due process, pursuant to the fifth and fourteenth Amend-

4   ments. The evidence uniquely tended to invoke prejudice against me as an in-

5   dividual and to inflame the jury's passion.(See People v. Wright,Supra,39 Cal.

6   3d at p.585.) Moreover, evidence of a defendants criminal disposition is inad-

7   missable to prove s/he committed a specific act under evidence code 1101. Even

8   where gang membership is relevant, because it may haveaa highly inflammatory

9   impact on the jury, trial courts should carefully scrutinize such evidence be-

10  fore admitting it.

11      In the present case, the graffiti exhibits should not of been attributed to

12  gang membership, because El Cajon Locos never appears in the exhibits in dis-

13  pute. At trial, the prosecutionaasked the gang detective a question regarding

14  the graffiti found inside the storage closet. The prosecution asked, "You just

15  picked examples that illustrated the defendants connection with the gang, with

16  the Locos gang generally"? The gang detective answered "correct".(See trial

17  transcript pg.1736.) Why then was the exhibits in dispute brought up? The gang

18  detective admitted to not documenting any of the three guys who were present at

19  the apartment, the day the search warrant was conducted. At trial, it was made

20  clear, that the apartment was a party house, which meant that anybody who was

21  not a gang member could've wrote the disputed graffiti, because El Cajon Locos

22  doesn't appear with the disputed exhibits. It was not fair to me to have such

23  prejudicial evidence presented at my trial, that somebody probably did during

24  a drunken moment.

25      Under the present ground, I present not one or two, but five graffiti exhi-

26  bits. Therefore, their cumulative prejudicial effect outweighed its probative

27  value, which had such an impact, that it prevented me from having a fair trial.

28  Due to the nature of the grafffti exhibits and their introduction at a trial

1   where the defense was self-defense, there was no way the jury even considered

2   the self-defense instruction after hearing and seeing what the graffiti exhibits

3   contained. Moreover, the jury was also instructed on manslaughter, had these

4   exhibits not been presented, it is highly probable, that the jury would've just

5   convicted me of manslaughter.

6

7                              **CONCLUSION**

8       Based on the foregoing, I request that this court grant an evidentiary

9   hearing on my claims, and ultimately grant my petition.

10

11

12

13                                    Respectfully submitted,

14                                    _Ramon Contreras_
                                      Ramon I. Contreras
15                                        In Pro se

16

17

18

19

20

21

22

23

24

25

26

27

28

I Ramon Contreras Sr. father of the petitioner, am a citizen of the United States
Over 18 years of age, currently residing at 1221 Oro st. # 10, El Cajon, CA. 92021
Served the following documents: A petition for writ of habeas corpus, a separate
memorandum with points and authorities, and supporting exhibits
To the following addresses:

Office of the clerk
U.S. District Court
880 Front Street, Suite 4290
San Diego, CA. 92101-8900


California Attorney General
San Diego office
110 West A street, suite 1100
San Diego CA. 92101

The envelopes were sealed and shipping fees were fully paid on 03/25/2008 at a U.S.
postal office located at 867 N. Second st. El Cajon, CA. 92021-9998 and thereafter were
sent as indicated.

The reason I am sending these documents on behalf of my son is, because he has a
difficult time in getting to the law library to make the necessary copies. He informed me
that he would be sending a notice, a day or two in advance, to the clerk of the court,
giving me consent to send the documents on his behalf.

I certify under penalty of perjury that the foregoing is true and correct.

Date: 3/25/2008          Ramon Contreras Sr.  Ramon Contreras