1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GARY W. SCHONS
   Senior Assistant Attorney General
4  DANIEL ROGERS
   Deputy Attorney General
5  DAVID DELGADO-RUCCI, State Bar No. 149090
   Deputy Attorney General
6   110 West A Street, Suite 1100
    San Diego, CA 92101
7   P.O. Box 85266
    San Diego, CA 92186-5266
8   Telephone:  (619) 645-2223
    Fax:  (619) 645-2191
9   Email:  David.DelgadoRucci@doj.ca.gov

10 Attorneys for Respondent

11            IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14  **RAMON IVAN CONTRERAS,** | 08-0572 DMS (POR) |
| 15                      Petitioner and Appellant, | **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PETITION FOR WRIT OF HABEAS CORPUS** |
| 16           **v.** | |
| 17  **A. HEDGPETH, Warden,** | Oral Argument Not Required |
| 18                      Respondent and Appellee. | |

19

20

21

22

23

24

25

26

27

28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GARY W. SCHONS
   Senior Assistant Attorney General
4  DANIEL ROGERS
   Deputy Attorney General
5  DAVID DELGADO-RUCCI, State Bar No. 149090
   Deputy Attorney General
6   110 West A Street, Suite 1100
    San Diego, CA 92101
7   P.O. Box 85266
    San Diego, CA 92186-5266
8   Telephone: (619) 645-2223
    Fax: (619) 645-2191
9   Email: David.DelgadoRucci@doj.ca.gov

10 Attorneys for Respondent

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14 | **RAMON IVAN CONTRERAS,** | 08-0572 DMS (POR) |

15 |            Petitioner and Appellant, | **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PETITION FOR WRIT OF HABEAS CORPUS** |

16 | **v.** |

17 | **A. HEDGPETH, Warden,** |

18 |            Respondent and Appellee. | Oral Argument Not Required |

19

20      COMES NOW RESPONDENT A. Hedgpeth, Warden, Kern Valley State Prison, Delano,

21 California, by and through his counsel, Edmund G. Brown Jr., Attorney General for the State of

22 California, and David Delgado-Rucci, Deputy Attorney General, and files this Memorandum of

23 Points and Authorities in support of the motion to dismiss the Petition for Writ of Habeas Corpus

24 as containing unexhausted claims.

25      This motion and memorandum of points and authorities is made in accordance with this

26 Court's order of March 4, 2008.

27                        **STATEMENT OF THE CASE**

28      On April 27, 2005, the District Attorney of San Diego County filed a second amended

1  information, charging Petitioner and co-defendant Torres with murder, Cal. Penal Code § 187, and

2  attempted murder, Cal. Penal Code §§187, 664.  Special circumstances of discharging a firearm from

3  a motor vehicle,  and committing the offense for the benefit of a gang were alleged, Cal. Penal Code

4  § 190.2(a)(21); (a)(22); (d).)   As to both counts, it was alleged that Petitioner and Torres

5  intentionally discharged a weapon and committed the crime to benefit a gang, Cal. Penal Code §§

6  186.22, 12022.53.  (Lod. 1; 1 CT 112-116.)

7          On April 28, 2005, a jury found Petitioner guilty of both offenses.  The jury found both

8  special circumstances true, as well as the other allegations.  (2 CT 371-375.)[1/]   The trial court

9  sentenced Petitioner to life without the possibility of parole, plus a life term, and an additional term

10  of 50 years to life.  (3 CT 599-600, 620.)

11          Prior to any action on the direct appeal, Petitioner filed a petition in the San Diego County

12  Superior Court, case number EHC501, on August 12, 2005. Petitioner alleged ineffective assistance

13  of trial counsel. (Lod. 2.)  The petition was denied on the basis that Petitioner failed to make a prima

14  facie showing that trial counsel committed error of constitutional magnitude.  (Lod. 3.)

15          On March 27, 2006, Petitoner filed an opening brief in the California Court of Appeal,

16  Fourth Appellate District, Division One, case number D047266.  Respondent filed a responding

17  brief, and Petitioner filed a reply brief.  (Lods. 4, 5, 6.)[2/]  On August 10, 2006, Petitioner filed a

18  petition for writ of habeas corpus in the San Diego County Superior Court, case number EHC 544.

19  (Lod. 7.)  On August 14, 2006, Petitioner filed a petition for writ of habeas corpus in the California

20  Court of Appeal, Fourth Appellate District, Division One, case number D049184 .  (Lod. 7.)  The

21  California Court of Appeal, Fourth Appellate District, Division One considered the petition with the

22  direct appeal.  (Lod. 8.)  The San Diego County Superior Court rejected the petition, EHC544,

23  finding it had no jurisdiction at the time because the Court of Appeal had both a direct appeal and

24  petition for writ of habeas corpus pending before it.  (Lod. 9.)

25  _____

26      1.  Torres was found guilty of second degree murder and premeditated attempted murder.
(2 CT 361, 363-375.)  Torres was sentenced to 70 years to life with an additional three year term.
27  (2 CT 297.)

28      2.  Briefs filed by Torres are omitted.

On December 15, 2006, the California Court of Appeal, issued two unpublished opinions. In the direct appeal, case number D047266, the court rejected the claim of insufficient evidence regarding the gang enhancement; the admission of graffiti; and the firearm enhancement. The court modified Petitioner's credits to give him 1 additional day. (Lod. 10.) In the petition for writ of habeas corpus, case number D049184, the court rejected the claim of ineffective assistance of trial counsel based on various assertions. (Lod. 11.)

Petitioner filed a petition for review in the California Supreme Court, case number S149487. (Lod. 12.) Petitioner also filed a petition for writ of habeas corpus in the California Supreme Court, case number S149263. (Lod. 13.) The petition for review from direct appeal was denied on February 21, 2007. (Lod. 14.) The petition for review from the petition for writ of habeas corpus was denied on March 21, 2007. (Lod. 15.)

On April 11, 2007, Petitioner filed a petition for writ of habeas corpus in the San Diego County Superior Court, case number EHC575, asserting error in the admission of graffiti evidence. (Lod. 16.) On May 25, 2007, the San Diego County Superior court rejected the petition because issues raised and litigated on direct appeal could not be revisited on habeas corpus. (Lod. 17.)

Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Fourth Appellate District, Division One, case number D051066. (Lod. 18.) It was denied as a successive petition. (Lod. 19.) On September 20, 2007, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, case number S156461. (Lod. 20.) It was denied on March 12, 2008. (Lod. 21.)

Petitioner filed the instant Petition for Writ of Habeas Corpus in this Court on March 26, 2008.

## STATEMENT OF FACTS

**Summary**

OEK (Organized Entres Kabrones) and Locos, were rival Hispanic street gangs in El Cajon, during 2003 and early 2004. Altercations between the gangs culminated in the death of 18 year old Jimmy Martinez, and the shooting of 19 year old Filiberto Lamas. Petitioner and Torres were members of the Locos gang. Martinez and Lamas were members of the OEK gang. (2 RT

1 288-290; 5 RT 887-888; 6 RT 1280.) Petitioner and Torres claimed they fired at Lamas and

2 Martinez in self defense.

3 **The Facts**

4 The facts commence with the latest incident, which was the basis for the charges, and then

5 include prior altercations between the gangs so that the shooting can be placed in context as a

6 continuation of events between the street gangs.

7 On January 6, 2004, Jimmy Martinez and his girlfriend Becky Soto went to Lamas'

8 residence in Harbison Canyon at approximately 10:00 p.m. They drove in Martinez's Honda Civic.

9 (Lod 23; 2 RT 311-312; 5 RT 989.) At the time, Lamas was on house arrest for possession of a

10 concealed knife. (2 RT 312, 419.) The trio went to the Key Largo apartments, which is considered

11 Locos territory, to see Linda Lopez. (2 RT 313-314; 5 RT 993.)[3]

12 Lamas talked to Lopez and then got back into the car with Martinez and Soto. The trio

13 left. (2 RT 316; 5 RT 993-994.)[4] The three then went to the Bella Vista apartments, which is OEK

14 territory. (2 RT 317; 5 RT 995.) Lamas tried to find his friends and was told his friends were at a

15 trailer on Lexington. (2 RT 318.) When he got back into the Honda, Lamas saw a dark colored

16 Mustang nearby. (2 RT 320.) As they were driving, Lamas again noticed the Mustang. When

17 Lamas and his two friends got near the trailer park, they made a U-turn to see if the Mustang was

18 following them. (2 RT 322-323; 5 RT 999-1002.) The Mustang slowed down and ended up right

19 behind them. (2 RT 323-324; 5 RT 999.)

20 There were two people in the Mustang. (2 RT 324.) Soto noticed the driver had a goatee

21 and black hair. (5 RT 1003.) Lamas told Soto to pull over. Soto complied. (2 RT 325; 5 RT 1004.)

22 No one in Lamas' vehicle made any signs or communicated in any way with the occupants of the

23 Mustang. (2 RT 325; 5 RT 1008-1009.) The driver of the Mustang stopped the car in the middle

24 of the street in front of Lamas and his friends. (2 RT 326; 5 RT 1006.)

25 _____

26 3. Zolia Linda Lopez lived in the Key Largo apartments and was Lamas' girlfriend. (2 RT
308; 4 RT 881.) Because the Key Largo apartments were in rival Locos territory, Lamas would
27 often get whistled at and threatened whenever he visited Lopez at her apartment. (2 RT 309.)

28 4. Lopez was not allowed to go out that night. (4 RT 883.)

1    Lamas asked Martinez if he had any weapons.  Martinez said he had a pocket knife.  (2

2    RT 326.)  Soto told Martinez to put the knife back.  (5 RT 1008.)  Lamas did not have any weapons.

3    (2 RT 327; 5 RT 1008.)  Lamas went to the driver's side of the Mustang while Martinez went to the

4    passenger side.  (2 RT 328-329; 5 RT 1007-1009.)

5    Petitioner was the driver of the Mustang.  Torres was the passenger.  (2 RT 403.)

6    According to Lamas, he was not involved in any type of altercation with either Petitioner or Torres

7    that night.  (2 RT 404-405.)  Lamas asked Petitioner and Torres where they were from.  (2 RT 330;

8    6 RT 1267.)  Someone responded but Lamas did not understand the response.  (2 RT 331; 6 RT

9    1267-1268.)  Soto then saw Lamas put his hands, appearing as if to fight.  (5 RT 1009-1010.)

10    Lamas said he was from OEK.  Someone said something like, "oh, that's cool."  (2 RT

11    331-332; 6 RT 1267.)  Lamas pushed Martinez away from the car.  He then heard someone say

12    "Fuck OEK."  Lamas saw a gun come up.  Shots were fired.  (2 RT 387; 6 RT 1268.)  Lamas thought

13    it was Torres who spoke.  Martinez looked surprised and stood up.  (2 RT 389.)  Lamas then saw

14    Martinez grab his stomach.  Lamas turned around and ran.  (2 RT 391.)

15    Lamas was shot in the back.  He heard the Mustang drive off.  Lamas returned to

16    Martinez.  (2 RT 392.)  Soto heard the shots.  She was screaming.[5/]  Lamas searched Martinez's

17    pockets for his cellular telephone.  The pocket knife fell out of Martinez's pocket.  (2 RT 394; 5 RT

18    1011, 1014-1015; 8 RT 1642, 1674.)  When Lamas did not find the cell phone, he ran back to the

19    Honda, grabbed the cell phone, and called the police.  (2 RT 396.)  A white truck and another car

20    parked nearby sped off.  (2 RT 397-398.)

21    Nearby residents heard two shots fired and the sound of a car speeding away.  (3 RT 560.)

22    One of the residents heard a woman crying, "Oh my God.  He has been shot."  (3 RT 561.)  Another

23    resident was awakened by a loud noise, then heard the squealing of tires.  (3 RT 574.)

24    Officers radioed a description of a newer black Mustang with paper license plates.  (5 RT

25    1074.)  La Mesa police officers stopped such a vehicle.  (5 RT 1074; 6 RT 1158-1161.)  In the

26   _____

27    5.  Soto later told officers that she heard Lamas say, "What's up? You got a beef with me?"
     (V RT 1089.)  Soto then saw a gun come out of the passenger window.  Martinez fell to the ground.
28    (V RT 1089, 1093.)

1    vehicle were Petitioner and Torres, who were both arrested.  (6 RT 1161-1162.)

2        A search of the vehicle revealed a loaded .41 caliber chrome Smith and Wesson revolver

3    on the rear passenger seat floor. (6 RT 1162; 8 RT 1566, 1594.)  A loaded .25 caliber semiautomatic

4    pistol with a .25 caliber magazine was found underneath the passenger seat.  (8 RT 1567, 1596.)

5    Petitioner's fingerprint was matched to a fingerprint on the barrel chamber on the .41 revolver.

6    Torres' fingerprint was also matched to a fingerprint on the barrel of the same .41 revolver.  (8 RT

7    1701.)

8        Also in the vehicle was a blue bag with marijuana in it.  The bag was found on the front

9    passenger floor board.  (8 RT 1567.)  A black bag with marijuana and a notebook with Petitioner's

10   name, weights and dollar amounts and "380 Block" written on it was found behind the driver's floor

11   board.  (8 RT 1567, 1599, 1601.)

12       What appeared to be blood spatter was found on the Mustang.  (8 RT 1579, 1626.)

13   Testing by DNA matched the blood splatter to Martinez.  (8 RT 1719.)

14       Soto was taken to a location by police, where she saw two people.  She identified

15   Petitioner and Torres as the driver and passenger, respectively.  (5 RT 1019-1021, 1075-1076.)

16       After Petitioner and Torres were taken to county jail, Petitioner was asked to disrobe as

17   part of the processing procedure.  He had a stab wound on his back.  (8 RT 1573, 1625.)

18       Lamas had a single gunshot wound to the abdomen.  (4 RT 668.)  The bullet was removed

19   and Lamas survived.  (2 RT 402; 4 RT 669-670.)  Martinez died from two gunshot wounds; one to

20   his head, and the other to his abdomen.  (2  RT 344.)[6/]  The autopsy of Martinez recovered a bullet

21   jacket and a .41 caliber bullet from Martinez's brain.  (2 RT 349-350; 8 RT 1677.)  The bullet was

22   identified as having been fired from the .41 caliber weapon discovered in the Mustang.  (8 RT 1729.)

23   A .25 caliber bullet was recovered from Martinez's abdomen.  (2 RT 353; 8 RT 1677, 1729.)  This

24   bullet was consistent with the .25 caliber weapon found in the Mustang, although it could not be

25   positively identified as having been fired from that gun.  (8 RT 1729.)

26

27

28       6. A search of the Honda revealed there were no weapons in it.  (8 RT 1642.)

1      **Other Evidence**

2          Elaina Welch was the owner of the Mustang.  She was Torres' roommate.  (2 RT 272; 6

3  RT 1270.)

4          Ryan Slagle had lived in the same Key Largo apartments as Petitioner and Torres had for

5  10 years.  (3 RT 583-584.)  During the month of January 2004, he lived in Welch's apartment in

6  Lakeside.  (3 RT 584; 4 RT 754.)  Petitioner sold marijuana and sometimes sold the drug to Slagle

7  and his friends.  (3 RT 615.)  Slagle said that neither Petitioner or Torres were gang members.  (3

8  RT 646.)

9          Slagle testified he bought Torres' car in November 2003.  When he was in the car, he was

10  shot at, and people pointed at him.  (4 RT 657-658.)

11          In a room under the stairs of the apartment that he shared with Welch, there was graffiti

12  on the walls.  The graffiti referenced the Locos gang.  (3 RT 588; VII RT 1412-1427.)  The phrase,

13  "Quit being a bitch and kill someone" was written inside the closet.  (3 RT 594.)  There was a

14  drawing of firearms with ".41 magnum," and ".357 magnum."  Other graffiti included "KL" which

15  stood for Key Largo, as well as "OPHS," which stood for "Orphans," a gang which got along with

16  the Locos gang.  (3 RT 595-596.)  An additional graffiti read ".41 magnum plus .357 magnum equals

17  187."  The number "187" referred to a code for murder.  (3 RT 597.)[7]

18          Additional drawings included some birds and cross hairs with the words "we hate

19  duckies," which was a disparaging reference to the Dukes gang.  (3 RT 600.)[8]   Other graffiti

20  included "LS" and "X3," which stood for Locos.  (3 RT 600.)  There was also a list of Locos gang

21  members written on the wall.  (3 RT 616-618.)

22          Slagle told an officer that both Petitioner and Torres did most of the writing in the closet.

23  (6 RT 1274.)  Slagle also said that Soto drew the guns.  (3 RT 652.)

24          Prior to January of 2004, the windows on Torres' vehicle were broken.  Someone had

25  written graffiti on the vehicle.  Larry McNeil believed either the OEK or Dukes gang had done it.

26  _____

27      7.  California Penal Code section 187 is the statute for murder.

28      8.  The Dukes and OEK gangs got along.  The Dukes and Locos did not.  (5 RT 1026.)

1    (4 RT 725, 734.) McNeil told Torres not to get sucked in because of it, referring to retaliation and
2    possible gang violence. (4 RT 735.)

3        On the day of the murder, Petitioner and Torres were at Welch's residence, located at
4    Camino Canada. Also present were McNeil[9] and Jeff Boursaw.[10] (3 RT 605-606, 613.) They were
5    drinking alcohol that night. (4 RT 716, 770.) Petitioner asked Welch if he could drive her new
6    black Mustang convertible. He said they were going down the street. (4 RT 770-771.) Welch
7    agreed and gave Petitioner and Torres the keys. The two left. It was a late hour. (3 RT 609; 4 RT
8    772.) When Petitioner and Torres did not return, Welch called them on a cellular telephone. No one
9    responded. (4 RT 777.) Petitioner called Welch early in the morning and told her the car had been
10   impounded. (4 RT 778.)

11       During a search of Welch's residence, an expended gunshot shell was found in the
12   bathroom. Welch did not know how it got there. (4 RT 781-782; 6 RT 1260; 8 RT 1581, 1585.)
13   As to the graffiti on the walls, Welch admitted writing some of it in the closet. (4 RT 762.) Welch
14   told an officer that Petitioner and Torres did most of the writing. (6 RT 1277.)

15       Welch also said that Torres told her his car had been damaged and that he was afraid
16   because he had lived at the Key Largo apartments. (4 RT 788.) Torres told Welch he feared that
17   the people who had stabbed Petitioner might come after him. (4 RT 789.)

18       A search warrant was executed at Petitioner's residence on North Mollison. Baggies with
19   marijuana residue in them were found. (6 RT 1170.) In the night stand in the bedroom of
20   Petitioner's father was $7300 in cash. There was a strong odor of marijuana on the money. (6 RT
21   1171; 7 RT 1410.) A scale was found in the same location. It too smelled like marijuana. There
22   was also a pay/owe book. (6 RT 1171-1172; 7 RT 1410-1411.)

23       A white Dodge Durango belonging to Petitioner's father was also searched. Inside the
24   glove compartment, officers found a black ski mask, a box with five .41 caliber rounds and one .357

25

26   _____

    9. McNeil admitted drawing on the walls in Welch's closet. (4 RT 714.)

27   10. Larry McNeil, known by two other names, "Black Larry" and "Crazy Larry," as well
28   as Boursaw and Torres all stayed at Welch's apartment. (4 RT 709, 713, 755.)

1    caliber round, two disposable cameras and a CD box with a CD entitled "Big Bad 380 block."  (6

2    RT 1176-1179; 7 RT 1430.)

3        **Stabbing on December 28, 2003**

4            Evidence was also introduced of Petitioner being stabbed at the Bella Vista Apartments

5    on December 28, 2003.  Carlos Villegas , Frankie Soto and Arthur Soto were all members of the

6    Locos gang.  (4 RT 839.)  On that date, Villegas, Arthur Soto, and Petitioner went to the Bella Vista

7    apartments which were also known as "Little TJ."  During the visit, Villegas was stabbed.  (4 RT

8    842-844.)  The stabbing occurred when several vehicles drove up.  People inside the vehicles began

9    saying "OEK."  Several of the people alighted from the vehicles with bats in hand.  Villegas, Soto

10   and Petitioner threw bottles at them and then ran.  Villegas was stabbed.  (4 RT 845.)

11           Welch took Villegas to the hospital.  (4 RT 848.)  Petitioner called Ryan Slagle and told

12   him he had been stabbed.  (3 RT 597; 6 RT 1275.)  Slagle took Petitioner to the hospital.  (3 RT

13   598.)  Slagle told an officer that Petitioner said OEK gang was responsible for stabbing him.  (6 RT

14   1276.)

15           Petitioner spoke to an officer at the trauma room of Sharp Memorial Hospital.  (6 RT

16   1125.)  Petitioner said he was assaulted by a group of white males.  (6 RT 1136.)  In contrast,

17   Villegas, who had gone to the hospital, told officers he had been in an altercation and approached

18   by Black males.  Villegas said that while he was trying to climb a fence, he was stabbed.  (4 RT 853;

19   6 RT 1134.)  Villegas told a different officer he had gone to the Bella Vista apartments so that

20   Petitioner could visit a cousin.  (7 RT1441.)  They arrived at the apartment and Petitioner walked

21   away to visit some people.  It was then that a group of people rushed Villegas and the others.  (7 RT

22   1441.)

23           Other evidence of this event is as follows:  Augustine Medrano lived in the Bella Vista

24   apartments.  (4 RT 872-873.)  Medrano denied being from OEK.  (4 RT 878.)  Filiberto Lamas was

25   in OEK and was Medrano's friend.  (4 RT 879.)  Medrano testified that Petitioner was not at the

26   fight.  (4 RT 880.)  According to Detective Bates, who had spoken to Medrano about the fight,

27   Medrano said he was at a barbeque.  He saw 10 to 11 Locos gang members walk  up with their

28   sleeves covering beer bottles.  The Locos members said they were Locos and asked for "Ivan," who

1    lived at the apartments. They identified Ivan and started throwing bottles at him. Several people

2    came out of Ivan's apartment and joined in the fight. One of the men, Medrano, was identified as

3    a man named "Ramon" from Mollison. (7 RT 1443-1446.) Medrano stated that Ivan's apartment

4    was "shot up" a few days later. (7 RT 1446.)

5        Another witness to theses events was Tracey Oswald. She testified that on December 28,

6    2003, at about 9:30 p.m., she saw approximately 15 people running at the Bella Vista apartments.

7    (5 RT 888-891 .) Oswald was on her way to see Medrano, who was a member of yet another gang,

8    the Banditos. (5 RT 890.) Oswald knew there was a fight because people were screaming. (5 RT

9    892.) She picked up a man named Martin, who was not a member of any gang, as far as she knew.

10   They were then stopped by police. (5 RT 893.)

11   **Shooting At Tracey Oswald's Red Blazer**

12       Tracey Oswald had a red Chevy Blazer. She consorted with OEK gang members. (2 RT

13   306.) Several days after the December 28, 2003 event, Oswald picked up Martin, Ivan and Arthur

14   Soto from the Bella Vista apartments.   As they were driving, an unidentified person in a white Ford

15   Ranger shot at Oswald's Blazer. (5 RT 894-896, 898.) Oswald saw a driver and the shooter in the

16   Ranger. (5 RT 899.)

17       In a second event, on December 30, 2003, Oswald was driving with "Shorty," "Little One"

18   and "Rascal," all OEK members. A vehicle pulled up behind her Blazer and fired shots. (5 RT

19   904.) There were 3 to 4 men in the car. Oswald recognized one of the men as being from the Key

20   Largo apartments. (5 RT 906; 6 RT 1279.) A .12 gauge shotgun shell and wadding were collected

21   from the scene. (5 RT 985.)

22       On January 1, 2004, in a shooting at the Bella Vista apartments, responding officers went

23   to apartment 27. There were three holes in the door. The window was shattered. (5 RT 1063.) Two

24   .12 gauge shotgun shells were recovered from the patio. (5 RT 1064.) The .12 shotgun shells

25   recovered from the Bella Vista apartments and the one recovered from the shooting at Oswald were

26   fired from the same weapon. (8 RT 1733.)

27   **January 5, 2004 Shooting**

28       Didier Soto and Jose Herrera owned a teal Ford Mustang. (5 RT 952.) Didier Soto was

1   a Dukes gang member. (7 RT 1367.) Carlos Gonzales was driving the teal Mustang when someone

2   shot at him. (5 RT 952.) The shooting occurred at the corner of Avocado and Washington. A

3   person in a truck next to him asked him where he was from. Gonzales said he was from nowhere.

4   The person asked Gonzales if he was scared and then gave Gonzales "the finger." (5 RT 953.) The

5   person took out a gun. Gonzales fled, running the red light. (5 RT 955.) The truck followed.

6   Gonzales heard shots, became afraid and sped off. He told his cousin about the incident. His cousin

7   made a police report. (5 RT 957.)

8           There was a bullet hole in the Mustang. (5 RT 962.) Gonzales told an officer he had

9   friends who were members of the Dukes gang, and he also knew a OEK gang member. (8 RT

10  1712.)

11          A witness to the events, Gordon LaSeur, testified that he heard brakes screeching and then

12  saw a white truck hit a teal Mustang. The truck continued pushing the Mustang. A white Ford

13  Ranger then came onto the scene. LeSeur heard six gunshots. (5 RT 940-941.) LaSeur believed

14  there was only one person in the Ranger. (5 RT 943-944.) A gunshot shattered the windshield on

15  La Seur's vehicle, while another shot punctured the bumper. (5 RT 945, 979.)

16          Two .25 caliber brass casings were recovered from the scene. (5 RT 974; 8 RT 1672-

17  1673.) A bullet was recovered from the Mustang. (8 RT 1682.) Two of the bullets were fired from

18  the .25 caliber weapon found in Welch's Mustang. The other was inconclusive. (8 RT 1730-1731.)

19  **Gang Evidence**

20          In addition to the facts of the murder and prior clashes between gang members, there was

21  also general evidence of gangs.

22          The Locos and Orphans gangs were rival El Cajon gangs. (2 RT 292.) A gang fight had

23  to be started by someone. (2 RT 293.) In the fights with the Locos, bats and knives were used.

24  During one fight, someone used a golf club. (2 RT 296.)

25          Idel Hernandez was not a gang member but associated with gang members. He would

26  fight with them. Idel used a knife in a fight against the Locos and had stabbed a person. (2 RT 297-

27  298.)

28          There were 5 to 6 OEK members fighting against two carloads of Locos gang members

1  after school during February, 2003.  (2 RT 297-299.)  Later, at a nearby mall, some of the same
2  Locos gang members, along with Lamas and a friend, engaged in a verbal confrontation.  (2 RT 300-
3  301.)

4          Near the end of summer, 2003, some Locos members and Lamas started fighting at an
5  AM/PM near the Bella Vista apartments.  (2 RT 302-304.)

6          El Cajon Valley High School campus supervisor identified Petitioner as associating with
7  the Locos gang when he was on campus.  (6 RT 1194-1195.)  Petitioner was also involved in verbal
8  disputes with Dukes gang members.  (6 RT 1197, 1227-1228.)  Torres also attended El Cajon Valley
9  High School and was also associated with the Locos gang due to his living in the Key Largo
10 apartments.  (6 RT 1200, 1228.)

11         Field Resource personnel, Darrin Forster, of El Cajon Valley High School interviewed
12 Petitioner on February 25, 2002.  (6 RT 1244.)  Petitoner told Forster that he backed the Locos gang.
13 (6 RT 1244.)  In an on-campus incident, the Locos and the Dukes gangs had "mad-dogged" each
14 other.  School officials separated them.  (6 RT 1245-1246.)

15         A gang expert explained general criteria of gang membership to the jury.  (6 RT 1320-
16 1339.)  Respect was considered to be of utmost importance to gang members.  A lack of respect was
17 a grave insult.  (6 RT 1335-1336.)  When a gang member asked another gang member, "Where are
18 you from?" it was a challenge.  (6 RT 1289.)

19         On January 6, 2004, both Petitioner and Torres were not documented gang members.
20 They were later documented as such.  (7 RT 1369-1371, 1382-1409.)

21         The gang expert testified that the acts committed on January 6, 2004, were committed for
22 the benefit of a criminal street gang.  (7 RT 1454.)  As part of the gang enhancement allegations,
23 evidence was introduced that Ruben Arrona, a Locos gang member, had a prior conviction for
24 residential burglary on December 6, 2001.  (7 RT 1536, 1547, 1550.)

25 **Defense**

26         Only Petitioner's defense evidence is presented.

27         Petitioner admitted he backed the Locos gang but denied he was a gang member.  (10 RT
28 2094.)  Petitioner also admitted he began selling marijuana when he was 15 or 16 years old.  (10 RT

1    2096.) He denied ever writing anything on the walls of Welch's residence. (10 RT 2101.)[11/]

2         On December 28, 2003, Petitioner was stabbed when he, Arthur Soto, and Arthur's friend,

3    Carlos, went to the Bella Vista apartments. (10 RT 2107-2110.) According to Petitioner, OEK gang

4    members began walking behind them and asked where they were from. (10 RT 2110-2111.) A red

5    Chevy Blazer then drove up and several males jumped out. They ran at Petitioner and began yelling

6    "OEK." (10 RT 2112-2113.) Petitioner threw a beer bottle and hit one of the men. (10 RT 2114.)

7    Petitioner began running. He was chased by up to 9 males and was hit in the head with a baseball

8    bat and was stabbed. (10 RT 2115-2116.)

9         While Petitioner was recovering from this incident, Frankie Soto gave him a gun for

10   protection. (10 RT 2125.) An Orphans gang member named "Danny Boy" visited him and gave

11   him a shotgun shell. (10 RT 2128.)

12        Petitioner learned about the shooting of Oswald's truck from Frankie Soto. (10 RT 2129.)

13        On January 6, 2004, Petitioner took the gun Soto gave to him to Welch's residence. (10

14   RT 2130.) Torres asked him for a ride. (10 RT 2133.) While driving, Petitioner followed a vehicle

15   that had an attractive girl in it. (10 RT 2135.) Petitioner said he did not notice any men in the car

16   until they turned into a trailer park. (10 RT 2136.) Petitioner passed a Honda, then made a U-turn

17   to go to a fast food establishment. Petitioner saw the Honda again. The passenger of the Honda put

18   his hand out of the window as if signaling for them to follow. (10 RT 2137.) Petitioner Contreras

19   followed. (10 RT 2139.)

20        As they went around a curve, Petitioner lost sight of the Honda. When he went around

21   the curve, he saw the Honda parked. There were two men standing in the street. (10 RT 2140.)

22   Lamas had a hand up as if signaling to Petitioner to stop. (10 RT 2141.) Petitioner drove past

23   Lamas then stopped his vehicle. Lamas and Martinez approached Petitioner and Torres. Lamas had

24   his hand under his jacket. (10 RT 2142.) Petitioner said he was scared. Lamas asked them where

25   they were from. Torres said they were from nowhere. Lamas said, "This is the OEK gang." Torres

26

27   _____

28      11. This was contrary to Welch's testimony that both Petitioner and Torres did most of the writing. (6 RT 1277.)

said he did not want any trouble.  (10 RT 2143.)  Martinez said. "Fuck that."  Petitioner said that

Martinez jumped up and had something in his hand.  Petitioner fired because he thought Martinez

had a gun and was going to shoot them.  (10 RT 2144-2145.)  Petitioner drove away.  (10 RT 2146.)

Petitioner admitted that he was called "Clumzy" and he was listed as such on a Locos gang

roster in Welch's closet.  (10 RT 2149-2150.)  Petitioner said he not did drink or smoke marijuana

that night.  (10 RT 2173.)

## ARGUMENT

## I.

### THE PETITION FOR WRIT OF HABEAS CORPUS CONTAINS UNEXHAUSTED CLAIMS AND MUST BE DISMISSED

Rule 4 of the Rules Governing Section 2254 Cases in the District Court ("Federal Habeas

Corpus Rules") and Ninth Circuit precedent have specifically authorized the submission of a motion

to dismiss as a responsive pleading to a petition for writ of habeas corpus.  White v. Lewis, 874 F.2d

599, 602 (9th Cir. 1989).  Indeed, "responding to a habeas petition with a motion to dismiss is

common practice."  Id. at 603 (citing as an example, Murray v. Carrier, 477 U.S. 478, 483, 106 S.

Ct. 2639, 91 L. Ed. 2d 397 (1986)).

As a matter of comity, a federal court will not entertain a habeas corpus petition unless

the petitioner has exhausted the available state judicial remedies on every ground presented in the

petition.  Rose v. Lundy, 455 U.S. 509, 518-22,102 S. Ct.1198, 71 L. Ed. 2d 179 (1982). The habeas

statute now explicitly provides that a habeas petition brought by a person in state custody "shall not

be granted unless it appears that-- (A) the applicant has exhausted the remedies available in the

courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii)

circumstances exist that render such process ineffective to protect the rights of the applicant." 28

U.S.C. § 2254(b)(1). Moreover, if the exhaustion requirement is to be waived, it must be waived

expressly by the State, through counsel. See 28 U.S.C.4 §2254(b)(3).

The exhaustion doctrine is based on the policy of federal-state comity, designed to give

state courts the first opportunity to correct alleged constitutional violations.  Picard v. Connor,

404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971); accord Duncan v. Henry, 513 U.S. 364,

365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995).  As a matter of comity, a federal habeas petitioner must give the state courts a fair opportunity to apply controlling legal principles to the facts relevant to his constitutional claim before bringing the claim to federal court.  O'Sullivan v. Boerckel, 526 U.S. 838, 842, 844, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999).

To meet the exhaustion requirement, the petitioner must have presented the same factual basis and legal theory for the claim that he presents in federal court.  Gray v. Netherland, 518 U.S. 152, 163, 116 S. Ct. 2074, 2081, 135 L. Ed. 2d 457 (1996); Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996).  The petitioner must alert the state court to the fact that he is asserting a claim under the United States Constitution.  Shumway v. Payne, 223 F.3d 982, 987-988 (9th Cir. 2000); Hiivala v. Wood, 195 F.3d 1098, 1106-1107 (9th Cir. 1999).  This means the petitioner must specifically indicate to the state court that his claims are based on federal law.  Lyons v. Crawford, 232 F.3d 666, 668-70 (9th Cir. 2000). To fulfill this requirement, the petitioner must make the federal basis of the claim explicit by citing either to federal law or the decisions of federal courts, "even if the federal basis is 'self-evident.'"  Id, at 668, quoting Gatlin v. Madding, 189 F.3d 882, 889 (9th Cir. 1999). Otherwise, the issue has not been fairly presented to the state court.  Lyons, at 668.

Respondent affirmatively declines to expressly waive the exhaustion requirement. Respondent affirmatively asserts that the Petition should be dismissed on account of Petitioner's failure to exhaust his state remedies as to part of claim one.  Petitioner candidly states that two of his sub-claims have not been presented to the state courts.

Petitioner makes an overall claim of ineffective assistance of trial counsel.  One of the basis for this claim is that trial counsel did not do a good job cross-examining witnesses, often getting names and incidents mixed up.  (Memo. at 8-10.)  In support of this claim, Petitioner cites an example of failing to adequately prepare for cross examination.  That example involves benefits for Maria Soto provided by the prosecution.  Petitioner states, "Another example, that proves counsel failed to properly prepare himself, in order to conduct adequate cross-examinations [sic], is one that **I didn't present to the state courts**."  (Memo. at 9-10; emphasis added.)

This sub-claim is unexhausted, as Petitioner has candidly affirmed that it was not presented to the state courts.

1    In a second sub-claim, Petitioner argues there were letters that trial counsel should have

2    used at trial. (Memo. at 10-20.) In that sub-claim, Petitioner states, **"The reason I didn't present**

3    **these letters to the state courts** is, because I didn't get the letters back in my possession until I

4    already sent my petition for review to the California Supreme Court. (Memo. at 14; emphasis

5    added.)[12/]

6    Exhaustion requires that the prisoner's contentions be fairly presented to the state courts,

7    and be disposed of on the merits by the highest court of the state. See James v. Borg, 24 F.3d 20,24

8    (9th Cir. 1994), cert. denied, 513 U.S. 935 (1994); Carothers v. Rhay, 594 F.2d 225, 228 (9th Cir.

9    1979). A claim has not been fairly presented unless the prisoner has described in the state court

10   proceedings the operative facts and the federal legal theory on which his claim is based. See Duncan

11   v. Henry, 513 U.S. 364, 365-66, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995); Picard v. Connor, 404

12   U.S. 270, 275-78, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971); Johnson v. Zenon, 88 F.3d 828, 830 (9th

13   Cir. 1996). Petitioner has the burden of demonstrating that he has exhausted available state remedies.

14   See, e.g., Brown v. Cuvler, 669 F.2d 155, 158 (3d Cir. 1982).[13/]

15   Here, Petitioner has never presented parts of his sub-claims to the state courts, but now

16   presents them to this Court for consideration. This is a classic example of a failure to exhaust his

17   claims in state court. A federal court cannot entertain a petition that includes both exhausted and

18   unexhausted claims. Rose, 455 U.S. at 510. Petitioner has the option of amending the petition to

19   delete the unexhausted claims, or he may accept dismissal without prejudice to pursue the

20   unexhausted claims in state court. Id. [14/] Under the total exhaustion rule of Rose v. Lundy, if even

21   _____

22   12. It is noted that after Petitioner's petition for review, he filed another petition for writ of
23   habeas corpus in the California Supreme Court, case number S156461, which made no mention of
     these letters.

24   13. The Ninth Circuit has held that, for purposes of exhaustion, pro se petitions are held to
25   a more lenient standard than counseled petitions. See Sanders v. Ryder, 342 F.3d 991, 999 (9th Cir.
     2003), cert. denied, 541 U.S. 956 (2004); Peterson v. Lampert, 319 F.3d 1153, 1159 (9th Cir. 2003).

26   14. Although these are the only two options endorsed by the United States Supreme Court,
27   the Ninth Circuit has created a third option requiring the court in its discretion to grant a petitioner's
     request to hold the petition in abeyance until the unexhausted claims are exhausted. Kelly v. Small,
28   315 F.3d 1063, 1070 (9th Cir. 2003); Ford v. Hubbard, 330 F.3d 1086, 1099-1101 (9th Cir. 2003).

1  one of the claims being alleged by a habeas petitioner is unexhausted, the petition must be

2  dismissed. See Rose 455 U.S. at 522; see also Coleman v. Thompson, 501 U.S. 722, 731, 111 S. Ct.

3  2546, 115 L. Ed. 2d 640 (1991); Castille v. Peoples, 489 U.S. 346, 349, 109 S. Ct. 1056, 103 L. Ed.

4  2d 380 (1989).  However, more recently, the United States Supreme Court held that, in certain

5  "limited circumstances," a district court may stay a mixed petition and hold it in abeyance while the

6  petitioner returns to state court to exhaust his unexhausted claims.  See Rhines v. Weber, 544 U.S.

7  269, 277, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005) (holding "stay and abeyance is only appropriate

8  when the district court determines there was good cause for the petitioner's failure to exhaust his

9  claims first in state court").

10        Per Rhines, where the petitioner has presented the district court with a mixed petition and

11  the Court determines that stay and abeyance is inappropriate, the district court must "allow the

12  petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of

13  the entire petition would unreasonably impair the petitioner's right to obtain federal relief." See

14  Rhines, 544 U.S. Ct. at 278.  Here, Petitioner has not requested that this Court hold the Petition in

15  abeyance while he returns to state court to exhaust his state remedies with respect to his unexhausted

16  claims.  Neither has Petitioner made the necessary showing of good cause for invocation of the stay

17  and abeyance procedure.  Nor does it appear that petitioner could make such a showing.  This Court

18  could conclude that Petitioner should be afforded the opportunity to file an amended petition that

19  omits his currently unexhausted claims and is limited solely to his already exhausted claims.

20        As such, because the Petition is a mixed petition, the Court should advise Petitioner of his

21  three remedies to either, delete the unexhausted remedies, allow the Court to dismiss the petition

22  without prejudice in its entirety, or amend the petition to delete the unexhausted claims and move

23  to stay the proceedings pending exhaustion.

24

25

26

27

28

**CONCLUSION**

Based on the above, respondent respectfully requests this Court dismiss the Petition for Writ of Habeas Corpus as containing unexhausted claims.

Dated: May 14, 2008

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

GARY W. SCHONS
Senior Assistant Attorney General

DANIEL ROGERS
Deputy Attorney General

s/David Delgado-Rucci

DAVID DELGADO-RUCCI
Deputy Attorney General

Attorneys for Respondent

DDR:cp
80238590.wpd
SD2008700277

1

# TABLE OF CONTENTS

2

**Page**

3 STATEMENT OF THE CASE · 1

4 STATEMENT OF FACTS · 3

5 · Summary · 3

6 · The Facts · 4

7 · Other Evidence · 7

8 · Stabbing on December 28, 2003 · 9

9 · Shooting At Tracey Oswald's Red Blazer · 10

10 · January 5, 2004 Shooting · 10

11 · Gang Evidence · 11

12 · Defense · 12

13 ARGUMENT · 14

14 I.   THE PETITION FOR WRIT OF HABEAS CORPUS CONTAINS
     UNEXHAUSTED CLAIMS AND MUST BE DISMISSED · 14

15 CONCLUSION · 18

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

5    Brown v. Cuvler,
     669 F.2d 155 (3d Cir. 1982)     16

6    Carothers v. Rhay,
7    594 F.2d 225 (9th Cir. 1979)     16

8    Castille v. Peoples,
     489 U.S. 346, 109 S. Ct. 1056, 103 L. Ed. 2d 380 (1989)     17

9    Coleman v. Thompson,
     501 U.S. 722, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991)     17

10    Duncan v. Henry,
11    513 U.S. 364, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995)     14, 16

12    Ford v. Hubbard,
     330 F.3d 1086 (9th Cir. 2003)     16
13

     Gatlin v. Madding,
14    189 F.3d 882 (9th Cir. 1999)     15

15    Gray v. Netherland,
     518 U.S. 152, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996)     15

16    Hiivala v. Wood,
17    195 F.3d 1098 (9th Cir. 1999)     15

18    James v. Borg,
     24 F.3d 20 (9th Cir. 1994), cert. denied, 513 U.S. 935 (1994)     16
19

     Johnson v. Zenon,
20    88 F.3d 828 (9th Cir. 1996)     15, 16

21    Kelly v. Small,
     315 F.3d 1063 (9th Cir. 2003)     16
22

     Lyons v. Crawford,
23    232 F.3d 666 (9th Cir. 2000)     15

24    Murray v. Carrier,
     477 U.S. 478, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)     14
25

     O'Sullivan v. Boerckel,
26    526 U.S. 838, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999)     15

27    Peterson v. Lampert,
     319 F.3d 1153 (9th Cir. 2003)     16
28

**TABLE OF AUTHORITIES  (continued)**

**Page**

Picard v. Connor,
404 U.S. 270, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971)                              14, 16

Rhines v. Weber,
544 U.S. 269, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005)                              17

Rose v. Lundy,
455 U.S. 509, 102 S. Ct.1198, 71 L. Ed. 2d 179 (1982)                        14, 16, 17

Sanders v. Ryder,
342 F.3d 991 (9th Cir. 2003), cert. denied, 541 U.S. 956 (2004)                    16

Shumway v. Payne,
223 F.3d 982 (9th Cir. 2000)                                                         15

White v. Lewis,
874 F.2d 599 (9th Cir. 1989)                                                         14


**Statutes**

28 U.S.C.
  § 2254(b)(1)                                                                         14
  §2254(b)(3)                                                                          14

California Penal Code
  § 186.22                                                                              2
  § 187                                                                               2, 7
  § 190.2(a)(21)                                                                        2
  § 190.2(a)(22)                                                                        2
  § 190.2(d)                                                                            2
  § 664                                                                                 2
  § 12022.53                                                                            2

**Court Rules**

Rule 4 of the Rules Governing Section 2254 Cases in the District Court ("Federal Habeas Corpus
Rules)                                                                               14

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **Contreras v. Hedgpeth**

No.:    **08-0572 DMS (POR)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On May 14, 2008, I served the attached [**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PETITION FOR WRIT OF HABEAS CORPUS**] by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 110 West A Street, Suite 1100, P.O. Box 85266, San Diego, CA 92186-5266, addressed as follows:

Ramon Ivan Contreras
CDC# V-99014    C-6-129L
North Kern State Prison
P.O. Box 5104
Delano, CA 93216-0567
*Petitioner*

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on May 14, 2008, at San Diego, California.

| | |
|---|---|
| Cathey Pryor | *Cathey pryor* |
| Declarant | Signature |

80238704.wpd