# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RAMON IVAN CONTRERAS**, | Civil No.      08cv572 DMS (PCL) |
| Petitioner, | |
| | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE PETITION FOR WRIT OF HABEAS CORPUS** |
| vs. | |
| **MATTHEW CATE**, | |
| Respondent. | |

State prisoner Ramon Contreras is proceeding *pro se* with a Petition For Writ Of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (Doc. 1.)  He challenges his conviction for first degree murder, Cal. Penal Code § 187, and attempted murder, Cal. Penal Code §§ 187, 664,  which were accompanied by special circumstances findings of discharging a firearm from a motor vehicle with the intent of causing death and acting for the benefit of a street gang, Cal. Penal Code § 190.2(a)(21), a(22), (d); Cal. Penal Code §§ 186.22, 12022.53, in San Diego County Superior Court Case No. SCE236551, following an April 2005 jury trial.   In consideration of the lodged record, and for the reasons discussed below, it is recommended the Petition be **DENIED**.

## I.      STATEMENT OF FACTS

Federal habeas courts presume the correctness of a state court's determination of factual issues unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  The parties do not challenge the accuracy of the Court of Appeal's summary of the underlying facts adduced at trial.

The Organized Entres Kabrones (OEK) and Locos are rival Hispanic street gangs. Martinez and Lamas were members of the OEK gang, while Torres and Contreras either were Locos members or backed the Locos gang. In the evening of January 6, 2004, Martinez, his girlfriend Becky Soto and Lamas went to the Key Largo apartments in El Cajon to visit Lamas's girlfriend in Martinez's Honda Civic. The Key Largo apartments are located on Locos's "turf" and Lamas often received threats and whistles when he visited his girlfriend at her apartment. At the time, Lamas was under house arrest for possession of a concealed knife and the outing violated his curfew.

After visiting Lamas's girlfriend, the threesome went to another apartment complex to find their friends, but were directed to a trailer park. When Lamas got into the Honda he noticed a dark colored Mustang and saw the car again on the way to the trailer park. Soto made a U-turn to see if the Mustang followed them; eventually, the Mustang ended up right behind them. Soto noticed two people in the Mustang and that the driver had a goatee and black hair. Lamas and Soto later identified Contreras as the driver of the Mustang and Torres as the passenger.

After Lamas had Soto pull over, the Mustang stopped in the middle of the street in front of them. Lamas did not have any weapons and learned that Martinez had a pocketknife. Soto told Martinez to put the knife away, but did not remember what he did with it. Martinez walked to the passenger side of the Mustang and Lamas went to the passenger side rear of the car. Although Lamas recognized the defendants, he could not recall the context. Lamas identified himself as OEK and asked the defendants in a commanding voice where they were from, meaning what gang, received a response that he did not understand and then heard someone say "that's cool." Soto remembered that Lamas raised his hands as if he wanted to fight when he walked toward the Mustang, but saw nothing in his hands.

As Martinez leaned down to look inside the car with his hands by his sides, Lamas tried to push him away because he did not know what would happen. Lamas heard someone inside the car say "fuck OEK" and saw Martinez straighten up with a surprised look on his face. Lamas also saw a gun come up from inside the Mustang, heard a shot and saw Martinez grab his stomach. Torres then shot Lamas in the back as he ran toward the Honda. Lamas never saw Martinez take the knife out of his pocket and neither he nor Soto saw Martinez make any sudden or threatening moves.

After the Mustang "peeled out," Lamas ran back and saw that Martinez had been shot in the head. Lamas searched Martinez's pockets for a cell phone and pulled the pocketknife out. He dropped the knife, ran back to the Honda to call the police, with the first officers arriving in less than a minute. Police later recovered the folded pocketknife and found no other weapons at the scene.

The police located the Mustang and took the defendants into custody. A search of the car revealed a loaded .41 caliber revolver, containing both defendants' fingerprints, and a loaded .25 caliber semiautomatic pistol. Police also found two bags containing marijuana and a notebook with Contreras's name and drug weights and dollar amounts. Blood spatter on the Mustang matched Martinez, and Contreras had an oozing stab wound on his back.

Lamas survived a single gunshot wound to the abdomen, but Martinez died from gunshot wounds to his head and abdomen. The .41 caliber bullet removed from Martinez's brain matched the weapon found in the Mustang and the .25 caliber bullet removed from his abdomen was consistent with the other weapon in the Mustang, but could not be positively identified as having been fired from that gun. The angle of bullet that entered Martinez's forehead suggested Martinez was bending down as he was shot.

The defendants were charged with murder and attempted murder. As to both counts, it was alleged that the defendants intentionally discharged a firearm and committed the crime for the

benefit of the gang.  Special circumstances were also alleged as to the murder count of discharging a firearm from a motor vehicle and committing the offense for the benefit of a gang.  Also, as to the attempted murder, it was alleged that great bodily injury had been inflicted.

The matter proceeded to trial and both defendants testified.  About a week before the murder, OEK gang members stabbed Contreras while he was in OEK territory.  After the stabbing, Locos gang member Frank Soto (no relation to Becky Soto), gave Contreras a gun to protect himself.  Thereafter, Contreras never left the house without the gun and ultimately used it to shoot Martinez.  Contreras claimed Martinez suddenly straightened from a crouched position and had something in his hand.  Contreras believed Martinez had a gun and admitted that he and Torres almost simultaneously fired their weapons.  Contreras then heard Torres fire his gun a second time.  Torres claimed he fired his weapon after Martinez lunged at him and that he fired again when Lamas came toward him.  Although Torres admitted he did not see a gun, he believed that Martinez was going to shoot him.

At the conclusion of testimony, the People successfully amended the information to add a separate enhancement to the murder charge that it was perpetrated by a firearm from a vehicle against a person outside the vehicle.  A jury found Contreras guilty of first degree murder, Torres guilty of second degree murder, and both guilty of premeditated attempted murder.  The jury also found true all special circumstances allegations attached to both counts.  The trial court sentenced Contreras to state prison for life without the possibility of parole, plus a life term and an additional term of 50 years to life, and Torres to state prison for 70 years to life, with an additional three-year term.

(Lodgment 11, at 2-5.)

The Court of Appeal also described the following additional  facts taken from the trial record:

Torres shared an apartment with Elaina Welch, the owner of the Mustang, and Ryan Slagle.  Welch's apartment had a storage closet with Locos graffiti on the walls and a roster of Locos gang members.  At trial, El Cajon Police Detective Royal Bates testified about Hispanic street gangs and photographs of various graffiti found in Welch's closet.  The graffiti referred to the Locos and included derogatory terms toward other gangs, including OEK ("1-Eyed Kids") and Dukes ("Duck season is all year long" and "we hate Duckies").  The graffiti included phrases such as: "murder, death kill down 187 homicide, die, 187," "kill a cop today 187" and "die pig die pig."  Also on the wall was a drawing of firearms with the equation ".41 magnum" plus ".357 magnum" equals 187 and the words "quit being a bitch and kill someone."  Detective Bates testified that gang members knew "187" was the California Penal Code section for murder.

Contreras denied writing anything on the walls in Welch's closet, but admitted he was listed as a Locos member on the closet roster and that his nickname was "Clumzy."  Torres admitted writing his name on the wall and drawing some graffiti, but denied writing the equation, the sections about killing pigs or ducks, or about guns.  The name "Larry Torres" appeared twice on the wall and Detective Bates opined that "Crazy Larry" on the roster referred to Torres because he has never heard of or seen gang members allowing non-gang members to be included in a gang roster.

Detective Bates stated that the Locos claimed the Key Largo Apartments as their territory and were known for, among other things, narcotics and murder.  The Bella Vista Apartments, also in El Cajon, are considered to be OEK "turf" and the main rivals of this gang are the Locos and the Orphans.  Detective Bates testified regarding a number of violent encounters between Locos and OEK gang members, including: (1) a February 2003 stabbing of a Locos gang member or associate by an OEK gang member; (2) an incident in June 2003 when Torres was

shot at; and (3) a fight on December 28, 2003, at the Bella Vista Apartments in which Contreras and another Locos member were stabbed. Torres's vehicle was also vandalized and the graffiti suggested OEK or Duke gang members had committed the act.

Detective Bates explained that the most important thing for a gang member is to obtain status or "respect" and the acts of individual gang members can raise the reputation or status of the gang as a whole. Committing murder gains a gang member the most amount of respect and a person can be a victim of gang violence simply because they belong to a rival gang. Traveling into the neighborhood or territory of another gang is considered disrespectful and can lead to violent retaliation. Vandalism, such as damaging the property of a rival gang member, is also a sign of disrespect to the person vandalized and can lead to violent physical retaliation. It is considered an act of disrespect to be assaulted or injured by a rival gang member and gang members commonly use deadly force even for a slight act of disrespect. The police considered the defendants to be gang members based on their current crime and their prior close affiliation with the Locos and Detective Bates opined that the murder and attempted murder were done for the benefit, direction or in association with a criminal street gang.

(Lodgment 11, at 6-8.)

To the extent that an evaluation of petitioner's claims depends on an examination of the trial record, the Court herein has made an independent description of the record specific to those claims in the discussion section below.

## II. PROCEDURAL HISTORY

Petitioner filed a petition in the San Diego County Superior Court, case number EHC501, on August 12, 2005. (Lodgment 2.) He claimed ineffective assistance of trial counsel based on counsel's failure: 1) to select a proper jury and to excuse certain potential jurors; 2) to do a good job cross examining witnesses; 3) to ask questions that Petitioner wanted asked; 4) to impeach Filiberto Lamas by showing statements were inconsistent; 5) to call six witnesses for the defense; 6) to present a video re-enactment of the events of January 6, 2004; and 7) to check the criminal record of Jimmy Martinez. The petition was denied on the basis that Petitioner failed to make a prima facie showing that trial counsel committed errors of constitutional magnitude. (Lodgment 3, at 7.)

On March 27, 2006, Petitioner filed a direct appeal of his conviction in the California Court of Appeal, Fourth Appellate District, Division One, case number D047266. (Lodgment 4.) Petitioner claimed that the admission of the graffiti evidence was in error, that there was insufficient evidence to sustain the gang related enhancements, and that the sentence enhancement must be stricken. On August 14, 2006, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Fourth Appellate District, Division One, case number D049184. (Lodgment 8.) He claimed

ineffective assistance of trial counsel based on counsel's failure: 1) to select a proper jury and to excuse certain potential jurors; 2) to act in an appropriate manner in front of the jury; 3) to check the criminal record of Jimmy Martinez; 4) to impeach Filiberto Lamas by showing his statements were inconsistent and to check his criminal background; 5) to do a good job cross examining witnesses; 6) to ask questions that Petitioner wanted asked; 7) to call four witnesses for the defense; and 8) to exclude evidence of marijuana dealing from the jury.   The Court of Appeal considered the habeas petition with the direct appeal.  (Lodgment 9.)

Petitioner filed a petition for writ of habeas corpus in the San Diego Superior Court on August 10, 2006.  (Lodgment 7.)  The San Diego County Superior Court rejected the petition, EHC544, finding it had no jurisdiction at the time because the Court of Appeal had both a direct appeal and petition for writ of habeas corpus pending before it.  (Lodgment 10, at 3.)

On December 15, 2006, the Court of Appeal issued two unpublished opinions.  In the direct appeal, case number D047266, the court rejected the claim of insufficient evidence regarding the gang enhancement, the admission of graffiti evidence, and the firearm enhancement.  The court modified Petitioner's judgment to give him one additional day of credit and to strike a restitution fine. (Lodgment 11, at 16.)  With regard to the habeas petition, the court rejected the claim of ineffective assistance of trial counsel based on various assertions.  (Lodgment 12.)

Petitioner filed a petition for review in the California Supreme Court, case number S149487. (Lodgment 13.)  Petitioner also filed a petition for writ of habeas corpus in the California Supreme Court, case number S149263.  (Lodgment 14.)  The direct appeal petition for review was denied on February 21, 2007.  (Lodgment 16.)  The petition for writ of habeas corpus was denied on March 21, 2007.  (Lodgment 15.)

On April 11, 2007, Petitioner filed a petition for writ of habeas corpus in the San Diego County Superior Court, case number EHC575, asserting error in the admission of graffiti evidence. (Lodgment 17.)  On May 25, 2007, the San Diego County Superior Court rejected the petition because issues raised and litigated on direct appeal could not be revisited on habeas corpus.  (Lodgment 18.)

Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Fourth Appellate District, Division One, case number D051066.  (Lodgment 19.)  It was denied as a

1   successive petition.  (Lodgment 20.)  On September 20, 2007, Petitioner filed a petition for writ of

2   habeas corpus in the California Supreme Court, case number S156461.  (Lodgment 21.)  It was denied

3   on March 12, 2008.  (Lodgment 22.)

4        Petitioner filed the instant Petition for Writ of Habeas Corpus in the Court on March 26, 2008.

5   (Doc. 1.)  Petitioner claimed that trial counsel was ineffective for various reasons, that the admission

6   of graffiti evidence was in error, and that there was insufficient evidence to sustain the gang related

7   enhancements.  Respondent filed an Answer (doc. 23), and Petitioner filed a traverse (doc. 31).

8   **III.    DISCUSSION**

9        **A.    Legal Standards For Federal Habeas Relief**

10       A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person

11   in custody pursuant to the judgment of a State court only on the ground he is in custody in violation

12   of the Constitution or laws or treaties of the United States."  28 U.S.C.A. § 2254(a).  Only errors of

13   federal law can support federal intervention in state court proceedings.  Oxborrow v. Eikenberry, 877

14   F.2d 1395, 1400 (9th Cir. 1989) (federal courts are not concerned with errors of state law unless they

15   rise to the level of a constitutional violation).  Federal habeas courts are bound by the state's

16   interpretation of its own law.  Estelle v. McGuire, 502 U.S. 62, 68 (1991) (federal courts may not re-

17   examine state court determinations on state-law questions); Jackson v. Ylst, 921 F.2d 882, 885 (9th

18   Cir. 1990) (federal courts "have no authority to review a state's application of its own laws").

19       Federal habeas petitions filed after April 24, 1996 are governed by the Antiterrorism and

20   Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 322-23

21   (1997).  AEDPA establishes a "highly deferential standard for evaluating state-court rulings,"

22   requiring "that state-court decisions be given the benefit of the doubt."  Woodford v. Visciotti, 537

23   U.S. 19, 24 (2002) (citation omitted).  The petitioner has "the burden of rebutting the presumption of

24   correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  A federal court can grant a

25   prisoner habeas relief only if it determines the result of a claim adjudicated on the merits by a state

26   court "was contrary to, or involved an unreasonable application of clearly established Federal law, as

27   determined by the Supreme Court of the United States," or "was based on an unreasonable

28   determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.

§ 2254(d); see Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court's decision is "contrary to" clearly established federal law if it (1) applies a rule that contradicts governing Supreme Court authority, or (2) it "confronts a set of facts that are materially indistinguishable from" a Supreme Court decision but reaches a different result. Early v. Packer, 537 U.S. 3, 8 (2002).  To be found "unreasonable," the application of the precedent "must have been more than incorrect or erroneous;" it "must have been 'objectively unreasonable.'"  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003) (citation omitted); Williams v. Taylor, 529 U.S. 362, 409-10 (2000) (distinguishing an objectively unreasonable application from an incorrect application); see also Middleton v. McNeil, 541 U.S. 433, 436 (2004) (*per curiam*).

The denial of a habeas petition by the California Supreme Court without comment or citation constitutes a decision "on the merits of the federal claims" presented.  Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992).  Where there is no reasoned decision from the state's highest court, the reviewing federal court "looks through" to the rationale of the underlying decision. Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim rest upon the same ground"); Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005) ("we review the 'last reasoned decision' by a state court").

**B.      Recommended Findings:  Each Ground For Relief Lacks Merit**

1. Claim One: Ineffective Assistance of Counsel

Petitioner claims that there was ineffective assistance of counsel in violation of the Sixth Amendment. (Doc. 1-1.)  Specifically, Petitioner asserts the following:

a) trial counsel had a conflict of interest because he and Petitioner did not agree regarding the composition of the jury;

b) trial counsel acted in a matter that caused prejudice to Petitioner, including the way trial counsel "raised his voice, asked questions, and carried himself during voir dire and throughout the trial;" trial counsel failed to file a motion for mistrial based on the perception of how potential jurors viewed trial counsel and the effect this view had on other jurors;

c) trial counsel failed to investigate whether Jimmy Martinez, who is deceased, had a criminal

1    record, and then lied to Petitioner that Martinez had no criminal record; trial counsel also

2    failed to investigate the criminal background of Filiberto Lamas and failed to impeach Lamas

3    with his criminal record;

4    d) trial counsel failed to do a good job cross-examining witnesses, as evidenced by trial

5    counsel getting names and incidents mixed up and not asking questions that Petitioner wanted

6    trial counsel to ask;

7    e) trial counsel failed to call three witnesses; and

8    f) trial counsel failed to suppress evidence of marijuana dealing.

9    The clearly established Supreme Court law regarding ineffective assistance of counsel claims

10   is governed by Strickland v. Washington, 466 U.S. 668 (1984); see Baylor v. Estelle, 94 F.3d 1321,

11   1323 (9th Cir. 1996) (stating that Strickland "has long been clearly established federal law determined

12   by the Supreme Court of the United States").  Strickland sets forth two elements that Petitioner must

13   show to demonstrate that his assistance of counsel was so defective it requires reversal of his

14   conviction.  First, Petitioner must show that counsel's performance was deficient.  Strickland, 466

15   U.S. at 687.  "This requires showing that counsel made errors so serious that counsel was not

16   functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.  Petitioner

17   "must overcome the presumption that, under the circumstances, the challenged action 'might be

18   considered sound trial strategy'."  Id. at 689.

19   Second, Petitioner must show counsel's deficient performance prejudiced the defense.  Id. at

20   687.  This requires showing that counsel's errors were so serious they deprived petitioner "of a fair

21   trial, a trial whose result is reliable."  Id.  To satisfy the prejudice prong, Petitioner must demonstrate

22   a reasonable probability that the result of the proceeding would have been different absent the error.

23   Id. at 694; Williams, 529 U.S. at 406.  The prejudice inquiry is to be considered in light of the strength

24   of the prosecution's case. Luna v. Cambra, 306 F.3d 954, 966 (9th Cir. 2002), amended, 311 F.3d 928

25   (9th Cir. 2002).  Finally, the Court need not address both the deficiency prong and the prejudice prong

26   if Petitioner fails to make a sufficient showing of either one.  Strickland, 466 U.S. at 697.

27   a) Jury Selection

28   Petitioner first claims that trial counsel had a conflict of interest because he and Petitioner did

8                                                    08cv572 DMS

not agree regarding the composition of the jury.  Petitioner argues that jury selection should have taken longer than a day and a half.  Petitioner cites two examples of jurors who should have been removed: The first involves a juror who stated he grew up in a gang environment and would get beaten up by gang members while walking to school; the second involves a juror who is a judge by profession.   (Pet. at 1; Trav. at 1.)

The last reasoned opinion was issued by the Court of Appeal on December 15, 2006 in response to Petitioner's Petition for a Writ of Habeas Corpus:

> Claims that an attorney employed poor tactics or could have handled a case more effectively are insufficient to show ineffectiveness of counsel (People v. Colligan (1979) 91 Cal. App. 3d 846, 851) and the decision whether to accept a jury as constituted is clearly a tactical one (People v. Bolin (1998) 18 Cal. 4th 297, 316).  To the extent Contreras claims he received ineffective assistance because counsel did not excuse several jurors . . ., he has failed to show prejudice as nothing in the record suggests it is reasonably probable that a different jury would have been more favorably disposed towards him.  (People v. Freeman (1994) 8 Cal. 4th 450, 487.)

(Lodgment 12, at 2-3.)

The right to preliminary voir dire does not mean that "limitless time" must be devoted to it; rather, the essential purpose is "to obtain impartial and indifferent jurors."  U.S. v. Wilson, 571 F. Supp. 1422, 1429 (D.C.N.Y. 1983).  The instant Petition lacks any details of actual bias of any of the jurors that sat on his case or any argument that a different jury would have decided the case differently.   The record shows that juror No. 3 said that his experience of being assaulted by gang members in his youth would have no effect on his ability to evaluate the evidence fairly.  (Lodgment 23, 3A RT 300.)  The record also shows that the juror who is a family law judge, juror No. 10, responded in voir dire that she would "most certainly" follow the trial court's instructions even if she disagreed with them.  (Lodgment 23, 3A RT 335.)  As neither of these two jurors expressed any actual bias, trial counsel's "failure to peremptorily challenge the two jurors was a tactical decision that does not constitute ineffective assistance of counsel."  Shuler v. Kernan, 77 Fed. Appx. 431, 432 (9th Cir. 2003).  Because Petitioner failed to provide any argument or evidence that another jury would have decided his case differently, the Court of Appeal's decision that Petitioner failed to show prejudice was not an unreasonable application of federal authority.  The Court finds that habeas relief is not available with respect to claim one, sub-claim a.

b) Trial Counsel's Demeanor

Petitioner claims that trial counsel acted in a matter that caused prejudice to Petitioner, including the way trial counsel "raised his voice, asked questions, and carried himself during voir dire and throughout the trial." Petitioner gives two examples of prospective jurors who made "extremely prejudicial comments about my attorney." (Pet. at 2.) First, Petitioner points to prospective juror No. 19, who admitted that she would not be comfortable sitting on the jury because she had already formed a bias against defense attorney, who she thought was being "pompous" during voir dire. (Id.; see Lodgment 23, 4 RT 454.) Second, Petitioner points to prospective juror No. 23, who questioned the sincerity of defense counsel. (Pet. at 2; see Lodgment 23, 4 RT 522.) Petitioner claims that these comments tainted the minds of those who were jurors in his case and that a mistrial should have been declared. (Pet. at 2-3.)

The last reasoned opinion was issued by the Court of Appeal on December 15, 2006 in response to Petitioner's Petition for a Writ of Habeas Corpus:

> Contreras also contends he received ineffective assistance because counsel failed to move for a mistrial after two prospective jurors reacted negatively to counsel. The purpose of voir dire, however, is to discover actual or potential juror bias (In re Hamilton (1999) 20 Cal. 4th 273, 295) and we know of no authority for granting a mistrial because voir dire questions exposed juror bias. Moreover, the court completed questioning one prospective juror outside the presence of other potential jurors, both prospective jurors were excused for cause and after empaneling the jury, the trial court pre-instructed it to determine the facts only from the evidence presented at trial and that it must not be biased against the defendants. We presume the jury followed these instructions (People v. Smithey (1999) 20 Cal. 4th 936, 961) and Contreras has not shown prejudice based on the responses of these prospective jurors.

(Lodgment 12, at 3.)

The purpose of voir dire is to expose prospective juror biases. Morgan v. Illinois, 504 U.S. 719, 729 (1992). "When improper or prejudicial remarks are made by one venireperson and heard by other venirepersons during the jury selection process, we have held that 'the test of juror impartiality is whether the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" United States v. Lacey, 86 F.3d 956, 969 (10th Cir. 1996) (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)). "The partiality of the petit jury is evaluated in light of those persons ultimately empaneled and sworn, not those who are excused from service." Id. Here, the defense attorney in this case did his job in exposing the biases of prospective jurors Nos. 19 and 23,

who subsequently were excused from the jury panel. Petitioner failed to cite any evidence that the empaneled jurors shared the sentiments of prospective jurors Nos. 19 and 23. The trial court instructed the empaneled jurors to not be biased against Petitioner, and nothing in the record suggests that the jury failed to act impartially in accordance with the judge's instruction, justifying a mistrial. Furthermore, Petitioner fails to cite any authority for his claim that defense counsel's demeanor as described constitutes ineffective assistance of counsel. As the Court of Appeal's decision finding no prejudice is not an unreasonable application of federal authority, claim one, sub-claim b, should be denied.

c) Failure to Investigate

Petitioner claims that trial counsel failed to investigate whether Jimmy Martinez, the alleged victim who is deceased, had a criminal record and then lied to Petitioner that Martinez had no criminal record when Petitioner asked about it. (Pet. at 4.) Following his conviction, Petitioner claims he discovered that Martinez in fact had a violent criminal record. (Id. at 5.) Petitioner argues that Martinez's record would have been crucial to his self-defense theory of the case and would have been admissible as character evidence. (Id. at 6; Trav. at 4.) Additionally, Petitioner claims that trial counsel failed to investigate the violent criminal background of the prosecution's main witness, Filiberto Lamas. Petitioner argues that Lamas could have been impeached by this evidence, damaging his credibility. (Pet. at 7.)

The last reasoned opinion was issued by the Court of Appeal on December 15, 2006 in response to Petitioner's Petition for a Writ of Habeas Corpus:

> Contreras contends he received ineffective assistance because counsel failed to impeach Martinez and Lamas with their respective criminal backgrounds. A witness may be impeached by evidence of prior conduct evincing moral turpitude even if that conduct was the subject of a juvenile adjudication, subject to the restrictions imposed under Evidence Code section 352 and other applicable evidentiary limitations. (People v. Lee (1994) 28 Cal. App. 4th 1724, 1739-40.) Here, however, Contreras presented no evidence outside the record showing that Lamas had a criminal record. In any event, there was evidence before the jury showing Lamas was a OEK gang member subject to a curfew for possession of a concealed weapon and that his outing on the night of the murder violated his curfew. Although Contreras presented new evidence showing that Martinez had prior arrests and suffered a true finding on a charge of assault with a deadly weapon, there was nothing to impeach because Martinez did not testify at trial.
>
> (Lodgment 12, at 3-4.)

11

"A claim of negligence in conducting pretrial investigation can form the basis for a claim of ineffective assistance." Cheung v. Maddock, 32 F. Supp. 2d 1150, 1159 (N.D. Cal. 1998) (citing United States v. Tucker, 716 F.2d 576 (9th Cir. 1983); Hines v. Enomoto, 658 F.2d 667, 676 (9th Cir. 1981)). What constitutes "adequate preparation of a defense turn[s] on the particular facts and circumstances of each case." Id. at 584. Adequate preparation does not necessarily require counsel to pursue "every path until it bears fruit or until all conceivable hope withers." Lovett v. Florida, 627 F.2d 706, 708 (5th Cir. 1980). "[T]he failure to investigate inadmissible evidence is not considered deficient representation." Penton v. Kernan, 528 F. Supp. 2d 1020, 1043 (S.D. Cal. 2007); see James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994). In making an admissibility determination, the Court must measure the likelihood that the evidence would have been admissible in California trial court. Id. at 1044.

With regard to trial counsel's failure to investigate Martinez's criminal record, the Court of Appeal acknowledged that Petitioner presented new evidence that Martinez had a criminal record but argued that it could not have been used as impeachment evidence because Martinez did not testify. While the Court of Appeal rightly concluded that Martinez's criminal record would have been inadmissible for its impeachment value against the victim, Petitioner argues that it would have been admissible to show the alleged victim's violent character by other means. Under California law, there are two ways that character evidence may be admissible. First, evidence of prior violence by a victim, of which the defendant is aware, is likely admissible. See People v. Cash, 28 Cal. 4th 703, 726 (2002). Second, evidence of felony convictions may be used for the purpose of attacking a witness' credibility. People v. Wheeler, 4 Cal. 4th 284, 298 (1992). Here, as Petitioner has admitted that he did not have personal knowledge of Martinez's criminal background until Petitioner discovered the information himself after his trial, the evidence could not have come in under a state-of-mind theory. Moreover, Petitioner has not suggested who could have been impeached by evidence of Martinez's prior felonies. Because Petitioner has not shown that evidence of Martinez's criminal background would have likely been admissible in his trial, the Court of Appeal's opinion that trial counsel's representation here was not deficient is not an unreasonable application of federal authority.

With regard to trial counsel's failure to investigate Lamas' criminal background, the Court of

Appeal stated Petitioner was not prejudiced by his trial attorney's failure to present additional evidence of Lamas' violent criminal background because the jury learned through other means that Lamas was an OEK gang member and had violated his curfew for possession of a concealed weapon. While Petitioner may have a valid argument that his attorney could have further used Lamas' criminal background for impeachment purposes, Petitioner has not shown the reasonable probability that the jury's verdict would have been different in light of the fact that the jurors had full knowledge of Lamas' involvement with gang violence when they evaluated this witness's credibility. Thus, it cannot be said that Court of Appeal's opinion denying this portion of the claim was unreasonable.

In sum, claim one, sub-claim c, should be denied.

d) Flawed Cross-Examination

Petitioner argues that trial counsel failed to do a good job cross-examining witnesses, as evidenced by trial counsel getting names and incidents mixed up and not asking questions that Petitioner wanted trial counsel to ask. (Pet. at 8-10.) Specifically, Petitioner claims that his attorney should have asked two prosecution witnesses, Suszko and Crownover, about overhearing a conversation of another prosecution witness, Soto, who stated that she was in a confrontation with Petitioner in a Mustang earlier in the day. (Pet. at 8.) Petitioner also argues that his attorney should have asked Soto about this earlier confrontation in cross-examination. (Pet. at 9.) Finally, Petitioner argues that his attorney should have known that Soto was receiving monetary benefits from the prosecution for her testimony and that he should have impeached her with this evidence.[1] (Pet. at 9-10.)

The last reasoned opinion was issued by the Court of Appeal on December 15, 2006 in response to Petitioner's Petition for a Writ of Habeas Corpus:

> Contreras claims his counsel confused names and incidents during cross-examination and did not ask certain questions that he believes were important to his defense.
>
> . . .
>
> Contreras presented extra-record evidence showing that two prosecution witnesses overheard

---

[1] Petitioner did not raise this issue in any state court. Even though it appears to be unexhausted, this Court can deny the claim if it perfectly clear it is without merit. Cassett v. Stewart, 406 F.3d 614, 623 (9th Cir. 2005).

08cv572 DMS

Soto stating that she and the victims had been involved in a confrontation with the individuals in the Mustang earlier on the day of the murder. Contreras claims counsel should have asked these witnesses what they overhead Soto saying and inquired of Soto whether she and the victims had an earlier confrontation with the individuals in the Mustang. Based on this evidence, he claims counsel could have argued that the victims exited the Honda to again confront the defendants, thereby supporting his self-defense argument. Counsel, however, had a clear tactical reason for not eliciting this evidence as it might have strengthened the prosecution's case that the shootings were retaliatory. This evidence would also have undercut Contreras's testimony that he had never seen the Honda before, had no idea who was in the car and did not recognize Soto or the Honda. Torres similarly testified that he did not recognize the Honda or the men and had no idea what they wanted.

. . .

Even if Contreras could show that counsel's performance was deficient in any respect, he provided no evidence showing the outcome of his case would have been different. As discussed in the related appeal, the case against him was strong. The court instructed the jury that it could find Contreras committed first degree murder by deliberation and premeditation or intentionally discharged a firearm from a vehicle with the specific intent to kill another person. The intent to unlawfully kill and express malice are essentially the same, with express malice requiring a showing that the assailant either desired the death or knew, to a substantial certainty, that death would occur. (People v. Smith (2005) 37 Cal. 4th 733, 739.) Here, the evidence clearly revealed that Contreras intentionally discharged a firearm from a vehicle and the jury could have found that he intended to kill Martinez because he had recently been stabbed and disrespected by an OEK gang member, he armed himself, pulled the gun from his waistband, pointed the gun from the car toward Martinez, a rival OEK gang member, and shot him.

(Lodgment 12, at 5-7.)

Trial counsel's strategy for impeaching a witness involves tactical decisions that are given great deference. Dows v. Wood, 211 F.3d 480, 487 (9th Cir. 2000). A petitioner pleading ineffective assistance of counsel due to counsel's failure to impeach a witness must demonstrate that, had the witness been impeached in the manner requested by petitioner, there would be a reasonable probability that the verdict would have been different. U.S. v. Holmes, 229 F.3d 782, 789-90 (9th Cir. 2000), cert. denied, 531 U.S. 1175 (2001).

Here, the Court of Appeal's opinion that trial counsel did not make unreasonable tactical decisions on cross-examination and that the outcome of Petitioner's case would not have been different had the three prosecution witnesses been impeached in the manner suggested by Petitioner is not an unreasonable application of Supreme Court authority. First of all, Petitioner's attorney could not have asked two prosecution witnesses, Suszko and Crownover, about a conversation of another prosecution witness, Soto, because the conversation would have been double hearsay. Secondly, had the trial attorney asked Soto about the earlier incident, it might

have bolstered the prosecution's theory that Petitioner shot Martinez with a retaliatory motive. Even if Petitioner's trial attorney could have successfully impeached Soto in this manner or with the alleged evidence that she was being paid for her testimony by the prosecution, there were other witnesses to the shooting including Filiberto Lamas, who was also shot in the incident and lived to testify in Petitioner's case.  Also, there was physical evidence that tied Petitioner to the incident and  showed a retaliatory relationship between the two gangs involved.  Thus, as Petitioner has failed to show prejudice by the allegedly deficient conduct of his trial attorney, claim one, sub-claim d, should be denied.

e) Failure to Call Three Witness

Petitioner argues that his trial counsel failed to call three witnesses:  Frank Soto, Alejandra Hurtado, and John Huynh.  (Pet. at 10.)  Petitioner states that trial counsel subpoenaed Hurtado and Huynh but did not call them to testify.  Petitioner also states that counsel did not subpoena Mr. Soto.  (Id.)

Petitioner states that Soto would have testified that he drew the gang graffiti in Welch's closet and that Soto gave Petitioner the gun used in the shooting.  (Pet. at 11.)  Next, Petitioner presents written letters evidencing that Hurtado would have testified that she told an investigator that the victim who was shot by Torres and survived, Filiberto Lamas, was jealous because Hurtado was dating Torres, was out to get him, and knew what kind of car he drove.  (Pet. at 12-15.)  Finally, Petitioner claims that Huynh would have testified that the reason why Petitioner and Torres left Petitioner's apartment on the night of the incident was that Huynh asked for a ride and that their intentions were to go to a Jack-In-The-Box to eat and then go back home.  (Pet. at 15.)  Petitioner states that Huynh would have testified that at no time was there a discussion of killing someone that night.  (Pet. at 15.)

The last reasoned opinion was issued by the Court of Appeal on December 15, 2006 in response to Petitioner's Petition for a Writ of Habeas Corpus:

> Contreras asserts his counsel was ineffective for failing to present three witnesses that he contends were vital to his defense; specifically Alejandra Hurtado, John Huynh and Frank Soto.  Contreras claims Hurtado would have testified that Lamas was jealous because Torres was dating her; however, because Torres rather than Contreras shot Lamas, Contreras failed to show how this evidence was relevant to his contention that he acted in

self-defense.  In any event, before the commencement of trial, the court discussed the letters that Hurtado had written to Torres, including a letter telling her story and asking whether that is "what is it that you want me to tell them."  The prosecution indicated that it planned to impeach her with those letters if she took the stand; accordingly, there was a clear tactical reason for counsel to not call Hurtado to the stand.

Contreras contends John Huynh would have testified that on the day of the murder the defendants left Huynh's apartment to get something to eat and then go home and there was no talk of killing anyone.  He also asserts that had Frank Soto testified, he would have admitted writing the equation and giving Contreras the .41 magnum gun.  This proposed evidence was duplicative of Contreras' own testimony and Slagle's testimony.  Contreras denied any assassination plan and explained that the defendants left Huynh's house intending to go to Jack-in-the-Box.  Even if the proposed evidence had been presented, it would not have been sufficient to permit the jury to conclude manslaughter or second degree murder rather than first degree murder had occurred . . . and Contreras offers no persuasive argument to the contrary.  Accordingly, Contreras has not shown any prejudice by the omission of these witnesses.

. . .

Even if Contreras could show that counsel's performance was deficient in any respect, he provided no evidence showing the outcome of his case would have been different.  As discussed in the related appeal, the case against him was strong.  The court instructed the jury that it could find Contreras committed first degree murder by deliberation and premeditation or intentionally discharged a firearm from a vehicle with the specific intent to kill another person.  The intent to unlawfully kill and express malice are essentially the same, with express malice requiring a showing that the assailant either desired the death or knew, to a substantial certainty, that death would occur.  (People v. Smith (2005) 37 Cal. 4th 733, 739.)  Here, the evidence clearly revealed that Contreras intentionally discharged a firearm from a vehicle and the jury could reasonably have found that he intended to kill Martinez because he had recently been stabbed and disrespected by an OEK gang member, he armed himself, pulled the gun from his waistband, pointed the gun from the car toward Martinez, a rival OEK gang member, and shot him.

(Lodgment 12, at 4-7.)

To show ineffective assistance of counsel based on the failure to call a witness, a petitioner must show that the witness was willing to testify, U.S. v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988), cert. denied, 488 U.S. 910 (1998); what the proffered testimony would have been, U.S. v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987); and that the proffered testimony would have sufficiently created a reasonable doubt as to guilt, Tinsley v. Borg, 895 F.2d 520, 532 (9th Cir. 1990), cert. denied, 498 U.S. 1091 (1991).

Here, Petitioner has not shown that the proffered testimonies of the three witnesses would have raised a reasonable doubt as to his guilt had they been called to testify at trial.  With regard to Soto, even if he had testified that he wrote the graffiti in the closet, Petitioner admitted that his name was listed in the gang roster written in the closet.  In other words, even with Soto's

16

testimony, there was other evidence that Petitioner was affiliated with a gang.  Moreover, Soto's

testimony regarding the gun would have undermined the defense's theory that Petitioner never

intended to kill anyone as having a gun prior to a shooting is probative of intent to kill.  With

regard to Hurtado, his testimony that Lamas was jealous of Torres would not have been relevant to

Petitioner's claim of self-defense because it was Torres, not Petitioner, who had shot Lamas.

Finally, with regard to Huynh, even if it were true that there was no discussion of killing anyone

that night, his testimony would not create a reasonable doubt as to guilt seeing as though Petitioner

testified that he himself  "fired a shot out of reaction" to a sudden movement by Martinez, who had

no weapon on hand.  (Lodgment 23, 10 RT 2144.)  Thus, it cannot be said that the Court of

Appeal's opinion was an unreasonable application of Supreme Court precedent.  Claim One, sub-

claim e, should be denied.

f) Failure to Suppress Evidence of Marijuana Dealing

Lastly, Petitioner claims that he was prejudiced by counsel's failure to suppress his

marijuana dealing from trial.  (Pet. at 19.)  Petitioner states that the prosecution's theory of the

case was that the murder was a result of a gang war, while the defense's theory was that the

shooting was self-defense.  (Pet. at 18.)  Petitioner states that the defense attempted to bifurcate the

gang allegations from trial but that it was denied by the trial court.  (Pet. at 18.)  Petitioner states

that his trial counsel should not have ask Petitioner so many questions about the drug dealing as

the discussion was prejudicial to him.  (Pet. at 20.)

The last reasoned opinion was issued by the Court of Appeal on December 15, 2006 in

response to Petitioner's Petition for a Writ of Habeas Corpus:

> Finally, Contreras claims counsel failed to suppress evidence of his marijuana dealing and
> asked too many questions regarding this issue, but does not explain how this evidence
> prejudiced him.  Moreover, counsel had a tactical reason for broaching the subject as part
> of the defense theory that the defendants were not "hunting" for rival gang members since
> both of the defendants sold marijuana, people would sometimes flag down Contreras' car
> and the defendants had marijuana and cash on hand at the time of the murder.

(Lodgment 12, at 6.)

"In order to establish prejudice from failure to file a motion, a petitioner must show that (1)

had his counsel filed the motion, it is reasonable that the trial court would have granted it as

1   meritorious, and (2) had the motion been granted, it is reasonable that there would have been an

2   outcome more favorable to him." <u>Travasso v. Clark</u>, 162 F. Supp. 2d 1106, 1118 (N.D. Cal. 2001)

3   (citing <u>Wilson v. Henry</u>, 185 F.3d 986, 990 (9th Cir. 1999)).   A "tactical decision by counsel with

4   which the defendant disagrees cannot form the basis of a claim of ineffective assistance of

5   counsel." <u>Guam v. Santos</u>, 741 F.2d 1167, 1169 (9th Cir. 1984) (per curiam).

6         Here, Petitioner does not offer any argument or citations to authority  as to why the drug

7   evidence should be suppressed. As the trial court denied defense counsel's motion to bifurcate the

8   gang allegations from the murder case, the evidence that Petitioner engaged in marijuana dealing

9   would have been relevant to show whether Petitioner was engaging in a type of activity associated

10   with gangs in the commission of the shooting.   Moreover, faced with the evidence that Petitioner

11   was a drug dealer, defense counsel attempted to show on cross-examination that Petitioner and

12   Torres had not gone out that night to kill someone but had gone out to do a drug delivery.  This

13   sort of cross-examination was a tactical strategy that did not fall below constitutional standards.

14   As the Court of Appeal's opinion was a reasonable application of federal authority, claim one, sub-

15   claim f, should be denied.

16         In sum, claim one should be denied because Petitioner has failed to show that his counsel's

17   performance was deficient partly or cumulatively.

18         2. Claim Two: Admission of Graffiti Exhibits was in Error

19         Petitioner argues that five pictures of graffiti exhibits should have been excluded from the

20   trial because they were irrelevant, prejudicial, and violated his Fifth and Fourteenth Amendment

21   rights.  (Pet. at 7, 21.)  Specifically, Exhibit 13 consisted of two guns with the equation "41

22   Magnum + 357 Magnum = 187" and the phrase, "Quit being a bitch and kill someone;" Exhibit

23   51-F stated, "380 El Cajon alcoholics serial killin rapist I will fuck your mother;" Exhibit 51-H

24   stated, "Kill a cop today;" Exhibit 51-K stated, "Die pig die pig;" and Exhibit 51-M stated, "Fuck

25   the pigs die pig die pig."  (Pet. at 22.)  Petitioner claims that he did not write the graffiti and that

26   he did not live in the apartment where it was written.  (Pet. at 22.)

27         The last reasoned opinion was issued by the Court of Appeal on December 15, 2006 in

28

1   response to Petitioner's direct appeal of his case:

2   > Before trial, the defendants moved in limine to exclude evidence of the equation located on
>   the wall in Welch's closet (".41 magnum" plus ".357 magnum" equals "187") on the
3   > ground there was no evidence the defendants wrote the equation and it was irrelevant and
>   unduly prejudicial.  The trial court concluded that the graffiti was relevant to the special
4   > circumstance allegations and the issue of motive and intent and indicated that because the
>   apartment was shared, the weight to be given the evidence was for the jury to decide.  At
5   > trial, Contreras denied writing anything on the walls in Welch's closet and Torres admitted
>   drawing some of the graffiti, but denied writing the equation.  Slagle stated that Frank Soto
6   > drew the guns and Detective Bates admitted he could not attribute the equation to the
>   shooting and had no knowledge of when the equation was written or by whom.
7   > . . .

8   > Evidence of a defendant's criminal disposition is inadmissible to prove he committed a
>   specific criminal act.  (Evid. Code, § 1101, subd. (a).)  However, such evidence is
9   > admissible if it is relevant to prove, among other things, motive, intent, knowledge, or the
>   existence of a common design or plan.  (Evid. Code, § 1101, subd. (b).)  If the trial court
10  > determines that certain evidence is admissible under Evidence Code section 1101,
>   subdivision (b), it must then determine whether the probative value of the evidence is
11  > substantially outweighed by the probability that its admission would create substantial
>   danger of undue prejudice, confusing the issues, or misleading the jury.  (People v. Ewoldt
12  > (1994) 7 Cal. 4th 380, 404; Evid. Code, § 352.)  We review the trial court's ruling under
>   Evidence Code sections 1101 and 352 for an abuse of discretion (People v. Lewis (2001)
13  > 25 Cal. 4th 610, 637) and will not reverse an evidentiary ruling unless the appellant
>   demonstrates a manifest abuse of that discretion.  (People v. Rodriguez (1999) 20 Cal. 4th
14  > 1, 9-10.)

15  > The defendants contend their convictions should be reversed because evidence of the
>   equation served only to prove their disposition to commit the crimes.  They also assert the
16  > evidence lacked foundation, was irrelevant, was unduly prejudicial and violated their
>   federal constitutional right to due process.  We disagree.

17

18  > Gang evidence is admissible if it is relevant to the underlying offense and any gang
>   enhancement.  (People v. Hernandez (2004) 33 Cal. 4th 1040, 1048-1051; People v. Martin
19  > (1994) 23 Cal. App. 4th 76, 81-82.)  Here, the information charged each of the defendants
>   with the special circumstances of committing the murder as an active member of a criminal
20  > street gang to further the activities of that gang (§ 190.2, subd. (a)(22)) and committing the
>   murder and attempted murder "for the benefit of, at the direction of, and in association with
21  > a criminal street gang."  (§ 186.22, subd. (b)(1).)

22  > The prosecution's theory of the case was that the defendants committed their crimes as part
>   of an escalating series of violent encounters between Locos and OEK gang members.  In
23  > order to prove the gang charge and enhancement allegations, the prosecution had to prove
>   that the Locos were an ongoing criminal gang.  The equation, viewed in connection with
24  > the other graffiti and evidence, had relevance as proof of the existence of the Locos gang
>   and its criminal nature, regardless of whether it could be linked to either of the defendants.
25  > The defendants' contention that they acted in self-defense also placed at issue their motive
>   and whether they harbored a murderous intent toward the victims as rival OEK gang
26  > members.  Moreover, the equation was no more prejudicial than other evidence introduced
>   at trial regarding the violent nature of the Locos gang.

27  > Even assuming the trial court erred by admitting the evidence, any such error was harmless
>   because there is no reasonable probability that it affected the jury's verdict.  (People v.
28  > Watson (1956) 46 Cal. 2d 818, 836.)  The People's evidence was strong.  The defendants

admitted the shootings, leaving only the issues of whether they acted for gang related purposes or in self-defense.  There was an abundance of evidence showing that the Locos and OEK were rival criminal street gangs with a history of violent confrontations. Contreras had been "disrespected" a week before the murder when an OEK member stabbed him during a confrontation and the defendants heard Lamas announce his OEK affiliation as he approached the Mustang.  In contrast, the evidence of reasonable self-defense was weak.  The defendants claimed that they fired their weapons when Martinez made a sudden move, but Lamas testified that Martinez had his hands by his sides, Soto never saw Martinez make any threatening movement with his hands and no gun was found at the crime scene.  Nonetheless, the trial court properly instructed on self-defense and the jury implicitly rejected this theory of the case.  Accordingly, the inclusion of the evidence in question was harmless.

(Lodgment 11, at 10-13.)

A petitioner who challenged a state court's admissibility ruling "is not entitled to habeas corpus relief unless the state court's admission of this evidence violated the petitioner's federal due process right to a fair trial under the Constitution."  Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990); see Engle v. Isaac, 456 U.S. 107, 119 (1982).  If the evidence is relevant and probative of some essential element of prosecution's case, there is no Due Process violation.  Estelle v. McGuire, 502 U.S. 62, 69-70 (1991); see Spencer v. Texas, 385 U.S. 554, 563-64 (1967) ("Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial . . . .  But it has never been thought that such cases establish this Court as a rulemaking organ for the promulgation of state rules of criminal procedure") (citations omitted).

Here, the Court of Appeal's opinion is a reasonable application of federal authority. California courts allow the prosecution to introduce gang evidence that is relevant to any gang activity enhancement allegations in a felony trial.  People v. Martin, 23 Cal. 4th.76, 77 (1994). "Where evidence of gang activity or membership is important to the motive, it can be introduced even if it is prejudicial."  Id.  Although the evidence of the graffiti was not linked by any direct evidence to being done by Petitioner, the evidence helped to demonstrate that the Locos gang, of which Petitioner was a member, was a violent one.  Even though Petitioner did not live in the apartment where the graffiti was located, his name was listed in the gang roster listed on the closet wall of the apartment.  Petitioner testified that he knew that the graffiti ".41+.357=187" meant "kill" (Lodgment 23, 10 RT 2170-71), and the prosecution connected this writing to the .41 caliber

handgun that was used in the shooting (Lodgment 23, 11 RT 2304). The jury saw other evidence including other graffiti establishing that there was a rivalry between the Locos gang and OEK gang, of which the victim was a member. Even though the evidence in question was highly prejudicial, it was probative of motive. As such, there was no Due Process violation by its introduction in Petitioner's murder trial. Claim Two should be denied.

### 3. Claim Three: Insufficient Evidence to Support Gang Related Enhancement

Petitioner claims that there was insufficient evidence to sustain the gang related enhancement in violation of Due Process. (Pet. at 8.)

The last reasoned opinion was issued by the Court of Appeal on December 15, 2006 in response to Petitioner's direct appeal of his case:

The defendants contend there was insufficient evidence to support the jury's gang enhancement findings; specifically, the evidence did not show they committed the offense "for the benefit of, at the direction of, or in association with [a] criminal street gang," and "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (Pen. Code § 186.22, subd. (b)(1), all undersigned statutory references are to this code.) Because the firearm (§12022.53, subd. (d)) and gang special circumstances (§190.2, subd. (a)(22)) enhancements depend on a proper finding of the gang enhancements, they also contend those allegations were unsupported by the evidence.

To resolve these issues, we view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the enhancement beyond a reasonable doubt. (People v. Johnson (1980) 26 Cal. 3d 557, 576.) The standard is the same where the prosecution relies primarily on circumstantial evidence. (People v. Miller (1990) 50 Cal. 3d 954, 992.) A jury may rely on expert testimony about gang culture and habits to reach a true finding on a gang enhancement allegation (People v. Ferraez (2003) 112 Cal. App. 4th 925, 930) and may reasonably rely on the testimony of a single witness, unless the testimony is physically impossible or patently false. (Evid. Code, §411; People v. Cudjo (1993) 6 Cal. 4th 585, 608.) We do not reweigh evidence or determine if other inferences more favorable to the defendant could have been drawn from it. (People v. Stanley (1995) 10 Cal. 4th 764, 793.)

When presented with a hypothetical paralleling the facts in this case, Detective Bates opined that the defendants' crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang. The jury could also reasonably infer that the defendants committed their crimes for these purposes from testimony establishing the following: (1) the defendants were Locos gang members or backed the Locos; (2) the victims belonged to the rival OEK gang; (3) the Locos and OEK have a history of violent encounters; (4) gang members seek to obtain respect and committing murder gains a gang member the most amount of respect; (5) murder is one of the principal activities of the Locos gang; (6) prior to the murder, Contreras had been stabbed by OEK gang members and Torres' property had been vandalized; (7) it is considered an act of disrespect to be assaulted or have your property vandalized by a rival gang member; and (8) gang members commonly use deadly force even for a slight act of disrespect.

As to the requirement that they acted "with the specific intent to promote, further, or assist

in any criminal conduct by gang members" (§186.22, subd. (b)(1)), the defendants argue there is no evidence showing they acted with the specific intent to promote criminal conduct by the Locos gang other than the charged offense and such a showing is required under <u>Garcia v. Carey</u> (9th Cir. 2005) 395 F.3d 1099 (<u>Garcia</u>). However, we are not bound by <u>Garcia</u>'s interpretation of section 186.22 (<u>People v. Burnett</u> (2003) 110 Cal. App. 4th 868, 882) and the plain language of the statute requires the specific intent only to promote, further or assist in "any" criminal conduct by gang members; it does not require a specific intent to benefit the gang or to further criminal activity other than the charged offense. (§ 186.22, subd. (b)(1); <u>People v. Romero</u> (2006) 140 Cal. App. 4th 15, 19, citing <u>People v. Morales</u> (2003) 112 Cal. App. 4th 1176, 1198.)

Intent is rarely susceptible of direct proof and usually must be inferred from the circumstances surrounding the offense. (<u>People v. Pre</u> (2004) 112 Cal. App. 4th 413, 420.) Here, the totality of the evidence supported the finding that the defendants intended to assist each other's criminal conduct. (<u>People v. Morales</u>, supra, 112 Cal. App. 4th at p. 1198.) Contreras argues he did not commit the crimes to further criminal conduct by other gang members, because the prosecutor argued the murder revenged his earlier stabbing. Nonetheless, even if Contreras simultaneously harbored a personal motive for his crimes, this does not mean the elements of the section 186.22, subdivision (b)(1) enhancement were not established. Because the evidence is sufficient to uphold the gang enhancement, we also uphold the dependent firearm and gang special circumstance enhancements.

(Lodgment 11, at 8-10.)

Here, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). In California, to be given the gang-enhancement penalty for a felony, the felonious criminal conduct must have been committed "for the benefit of, at the direction of, or in association with [a] criminal street gang," and "with the specific intent to promote, further, or assist in any criminal conduct by gang members." Pen. Code § 186.22, subd. (b)(1). The record shows the following: that Petitioner was on the Locos gang roster; that Locos and OEK were rival gangs, that Petitioner had been attacked by OEK gang members a week before the shooting; that after Petitioner and Torres stopped their car and began talking with the victims who were OEK gang members, either Petitioner or Torres shouted "fuck OEK" immediately prior to the shooting; and that an expert in gangs testified that, in his opinion, the shooting was gang related. On the other hand, the evidence that the shooting was done in self defense or solely for personal reasons as Petitioner contends is weak: the victim did not have a weapon on hand as his pocketknife was still in his pocket at the time of the shooting, and even though Torres believed that the victim was going to shoot them, Torres admitted to not seeing a gun or anything that resembled one in the victim's hand. Thus, the

Court of Appeal's opinion is not an unreasonable application of federal authority.  Claim Three should be denied.

**C.      Inadequate Showing For Evidentiary Hearing**

Lastly, Petitioner requests this Court grant an evidentiary hearing on his claims.  However, Petitioner fails to satisfy the threshold standards.  AEDPA "now substantially restricts the district court's discretion to grant an evidentiary hearing."  Baja v. Ducharme, 187 F.3d 1075, 1077-78 (9th Cir. 1999) ("a district court presented with a request for an evidentiary hearing . . . must determine whether a factual basis exists in the record to support the petitioner's claim"); 28 U.S.C. § 2254(e).  Even before AEDPA, "[a]n evidentiary hearing is not required on allegations that are 'conclusory and wholly devoid of specifics.'"  Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994) (citation omitted); see Bragg v. Galaza, 242 F.3d 1082, 1085, 1089-90 (9th Cir. 2001).  Nor is an evidentiary hearing required on issues that can be resolved by reference to the state court record. Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998).

Applying those standards to this record, it is recommended the Court find no additional factual development is warranted or authorized in Petitioner's case.  He identifies no new legal authority and relies on the same facts as he did in the state court proceedings.  28 U.S.C. § 2254(d)(2); see Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004).  His claims can all be resolved without any need to look outside the state court record.

**IV.     CONCLUSION AND RECOMMENDATION**

The Court submits this Report and Recommendation to United States District Judge Sabraw under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.  For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** this habeas petition be **_DENIED_** in its entirety on grounds the Petitioner is not in custody in violation of any federal right.  **IT IS FURTHER RECOMMENDED** the Court issue an Order:  (1) approving and adopting this Report and Recommendation; (2) directing that Judgment be entered denying the Petition; and (3) denying a Certificate of Appealability.

**IT IS HEREBY ORDERED** no later than April 16, 2010, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be

1    captioned "Objections to Report and Recommendation."

2         **IT IS FURTHER ORDERED** any Reply to the Objections shall be filed with the Court

3    and served on all parties no later than <u>April 23, 2010</u>.  The parties are advised that failure to file

4    objections within the specified time may waive the right to raise those objections on appeal of the

5    Court's Order.  <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951

6    F.2d 1153, 1156 (9th Cir. 1991).

7    DATED: April 2, 2010

8     

9                        Peter C. Lewis
                         U.S. Magistrate Judge

10                       United States District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28